# HARRIS *v.* ALABAMA

No. 93–7659. Argued December 5, 1994—Decided February 22, 1995

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 515.

*Ruth E. Friedman* argued the cause for petitioner. With her on the brief was *Bryan A. Stevenson*.

*P. David Bjurberg*, Assistant Attorney General of Alabama, argued the cause for respondent. With him on the brief was *James H. Evans*, Attorney General.

JUSTICE O'CONNOR delivered the opinion of the Court.

Alabama law vests capital sentencing authority in the trial judge, but requires the judge to consider an advisory jury verdict. We granted certiorari to consider petitioner's argument that Alabama's capital sentencing statute is unconstitutional because it does not specify the weight the judge must give to the jury's recommendation and thus permits arbitrary imposition of the death penalty.

# I

A defendant convicted of capital murder in Alabama is entitled to a sentencing hearing before the trial jury, Ala. Code § 13A–5–46 (1994), unless jury participation is waived by both parties and approved by the court, § 13A–5–44. The State must prove statutory aggravating factors beyond a reasonable doubt and must disprove, by a preponderance of the evidence, any mitigating circumstance the defendant may proffer. § 13A–5–45(g). The jury then renders an advisory verdict. If it finds that aggravating factors, if any, outweigh mitigating circumstances, then the jury recommends death; otherwise, the verdict is life imprisonment without parole. § 13A–5–46(e). The jury may recommend death only if 10 jurors so agree, while a verdict of life imprisonment requires a simple majority. § 13A–5–46(f). The recommendation and vote tally are reported to the judge.

The judge then must consider all available evidence and file a written statement detailing the defendant's crime, listing specific aggravating and mitigating factors, and imposing a sentence. Section 13A–5–47(e) provides:

> "In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to Section 13A–5–46(a) or 13A–5–46(g). While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court."

If the defendant is sentenced to death, his conviction and sentence are automatically reviewed by an appellate court and, if affirmed, a writ of certiorari is granted by the Alabama Supreme Court as a matter of right. In addition to reviewing the record for errors, the appellate courts must

independently weigh aggravating and mitigating circumstances and determine whether the death penalty is disproportionate to sentences rendered in comparable cases. § 13A–5–53(b).

Petitioner Louise Harris was married to the victim, a deputy sheriff, and was also having an affair with Lorenzo McCarter. She asked McCarter to find someone to kill her husband, and McCarter to that end approached a co-worker, who refused and reported the solicitation to his supervisor. McCarter then found willing accomplices in Michael Sockwell and Alex Hood, who were paid $100 and given a vague promise of more money upon performance. On the appointed night, as her husband left for work on the night shift, Harris called McCarter on his beeper to alert him. McCarter and Hood sat in a car parked on a nearby street, and Sockwell hid in the bushes next to a stop sign. As the victim stopped his car at the intersection, Sockwell sprang forth and shot him, point blank, with a shotgun. Harris was arrested after questioning, and McCarter agreed to bear witness to the conspiracy in exchange for the prosecutor's promise not to seek the death penalty. McCarter testified that Harris had asked him to kill her husband so they could share in his death benefits, which totaled about $250,000.

The jury convicted Harris of capital murder. At the sentencing hearing, a number of witnesses attested to her good background and strong character. She was rearing seven children, held three jobs simultaneously, and participated actively in her church. The jury recommended, by a 7 to 5 vote, that she be imprisoned for life without parole. The trial judge then considered her sentence, finding the existence of one aggravating circumstance, that the murder was committed for pecuniary gain, and one statutory mitigator, that Harris had no prior criminal record. The trial judge also found as nonstatutory mitigating circumstances that Harris was a hardworking, respected member of her church and community. Noting that Harris had planned the crime

and financed its commission and stood to benefit the most from her husband's murder, the judge concluded that "the one statutory aggravating circumstance found and considered far outweighs all of the non-statutory mitigating circumstances, and that the sentence ought to be death." App. 7. In separate proceedings, all the conspirators were convicted of capital murder. McCarter and Hood received prison terms of life without parole; Sockwell, the triggerman, was sentenced to death after the trial judge rejected a jury recommendation, again by a 7 to 5 vote, of life imprisonment.

The Alabama Court of Criminal Appeals affirmed Harris' conviction and sentence. 632 So. 2d 503 (1992). It noted that Alabama's death penalty statute is based on Florida's sentencing scheme, which we have held to be constitutional, see *Spaziano* v. *Florida,* 468 U. S. 447, 457–467 (1984); *Proffitt* v. *Florida,* 428 U. S. 242, 252 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.). One difference is that jury recommendations are to be given "great weight" by the sentencing judge in Florida, see *Tedder* v. *State,* 322 So. 2d 908, 910 (Fla. 1975), whereas Alabama only requires the judge to "consider" the advisory verdict. The Court of Criminal Appeals rejected Harris' contention that Florida's so-called *Tedder* standard is constitutionally required, however. 632 So. 2d, at 538. As the statute prescribes, the court then reviewed the record for prejudicial errors and independently weighed the aggravating and mitigating circumstances. Finding no errors and concluding that death was the proper sentence, the court affirmed. *Id.,* at 542–543. The Alabama Supreme Court also affirmed, discussing an unrelated claim. 632 So. 2d 543 (1993). We granted certiorari. 512 U. S. 1234 (1994).

## II

Alabama's capital sentencing scheme is much like that of Florida. Both require jury participation in the sentencing process but give ultimate sentencing authority to the

trial judge. Ala. Code § 13A–5–47(e) (1994); Fla. Stat. § 921.141(3) (1985). A sentence of death in both States is subject to automatic appellate review. Ala. Code § 13A–5–55 (1994); Fla. Stat. § 921.141(4) (1985). In Florida, as in Alabama, the reviewing courts must independently weigh aggravating and mitigating circumstances to determine the propriety of the death sentence, Ala. Code § 13A–5–53(b)(2) (1994); *Harvard* v. *State*, 375 So. 2d 833 (Fla.), cert. denied, 441 U. S. 956 (1977), and must decide whether the penalty is excessive or disproportionate compared to similar cases, Ala. Code § 13A–5–53(b)(3) (1994); *Williams* v. *State*, 437 So. 2d 133 (Fla. 1983), cert. denied, 466 U. S. 909 (1984).

The two States differ in one important respect. The Florida Supreme Court has opined that the trial judge must give "great weight" to the jury's recommendation and may not override the advisory verdict of life unless "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ." *Tedder* v. *State, supra,* at 910. The same deference inures to a jury recommendation of death. See *Grossman* v. *State,* 525 So. 2d 833, 839, n. 1 (Fla. 1988) (collecting cases). The Alabama capital sentencing statute, by contrast, requires only that the judge "consider" the jury's recommendation, and Alabama courts have refused to read the *Tedder* standard into the statute. See *Ex parte Jones,* 456 So. 2d 380, 382–383 (Ala. 1984). This distinction between the Alabama and Florida schemes forms the controversy in this case—whether the Eighth Amendment to the Constitution requires the sentencing judge to ascribe any particular weight to the verdict of an advisory jury.

We have held Florida's capital sentencing statute to be constitutional. See *Proffitt* v. *Florida, supra; Spaziano* v. *Florida, supra. In Spaziano,* we addressed the specific question whether Florida could, consistent with the Constitution, vest sentencing authority in the judge and relegate the jury to an advisory role. While acknowledging that sen-

tencing power resides with the jury in most States, we made clear that the "Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws." *Id.*, at 464. We therefore rejected the contention that "placing the responsibility on a trial judge to impose the sentence in a capital case is so fundamentally at odds with contemporary standards of fairness and decency that Florida must be required to alter its scheme and give final authority to the jury to make the life-or-death decision." *Id.*, at 465; see also *Walton* v. *Arizona*, 497 U. S. 639, 648 (1990); *Clemons* v. *Mississippi*, 494 U. S. 738, 745 (1990).

Asserting that the death penalty serves no function in "rehabilitation," "incapacitation," or "deterren[ce]," JUSTICE STEVENS argues that a jury "should bear the responsibility to express the conscience of the community on the ultimate question of life or death in particular cases." *Post*, at 517, 518 (internal quotation marks omitted). What purpose is served by capital punishment and how a State should implement its capital punishment scheme—to the extent that those questions involve only policy issues—are matters over which we, as judges, have no jurisdiction. Our power of judicial review legitimately extends only to determine whether the policy choices of the community, expressed through its legislative enactments, comport with the Constitution. As we have noted elsewhere, "while we have an obligation to insure that constitutional bounds are not overreached, we may not act as judges as we might as legislators." *Gregg* v. *Georgia*, 428 U. S. 153, 174–175 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.).

In various opinions on the Florida statute we have spoken favorably of the deference that a judge must accord the jury verdict under Florida law. While rejecting an *ex post facto* challenge in *Dobbert* v. *Florida*, 432 U. S. 282, 294 (1977), we noted the "crucial protection" provided by the standard of *Tedder* v. *State, supra*, at 910. In the same fashion, in

dismissing Spaziano's argument that the *Tedder* standard was wrongly applied by the lower courts in his case, we stated:

> "This Court already has recognized the significant safeguard the *Tedder* standard affords a capital defendant in Florida. See *Dobbert* v. *Florida,* 432 U. S. 282, 294–295 (1977). See also *Proffitt,* 428 U. S., at 249 (joint opinion). We are satisfied that the Florida Supreme Court takes that standard seriously and has not hesitated to reverse a trial court if it derogates the jury's role." *Spaziano, supra,* at 465.

These statements of approbation, however, do not mean that the *Tedder* standard is constitutionally required. As we stated in *Spaziano* immediately following the passage quoted above: "Our responsibility, however, is not to second-guess the deference accorded the jury's recommendation in a particular case, but to ensure that the result of the process is not arbitrary or discriminatory." 468 U. S., at 465. We thus made clear that, our praise for *Tedder* notwithstanding, the hallmark of the analysis is not the particular weight a State chooses to place upon the jury's advice, but whether the scheme adequately channels the sentencer's discretion so as to prevent arbitrary results. See also *Proffitt,* 428 U. S., at 252–253 (joint opinion of Stewart, Powell, and STEVENS, JJ.).

Consistent with established constitutional law, Alabama has chosen to guide the sentencing decision by requiring the jury and judge to weigh aggravating and mitigating circumstances. Harris does not challenge this legislative choice. And she objects to neither the vesting of sentencing authority in the judge nor the requirement that the advisory verdict be considered in the process. What she seeks instead is a constitutional mandate as to how that verdict should be considered; relying on Florida's standard, she suggests that the judge must give "great weight" to the jury's advice.

We have rejected the notion that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Franklin* v. *Lynaugh,* 487 U. S. 164, 179 (1988). Equally settled is the corollary that the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer. See, *e. g., Blystone* v. *Pennsylvania,* 494 U. S. 299, 306–307 (1990); *Eddings* v. *Oklahoma,* 455 U. S. 104, 113–115 (1982); *Proffitt, supra,* at 257–258 (joint opinion of Stewart, Powell, and STEVENS, JJ.). To require that "great weight" be given to the jury recommendation here, one of the criteria to be considered by the sentencer, would offend these established principles and place within constitutional ambit micromanagement tasks that properly rest within the State's discretion to administer its criminal justice system. We therefore hold that the Eighth Amendment does not require the State to define the weight the sentencing judge must accord an advisory jury verdict.

Harris argues that, under Alabama law, the verdict is more than advisory and that the jury in fact enjoys the key sentencing role, subject only to review by the judge. For support, she points to Alabama cases reversing death sentences where prejudicial errors were committed before the advisory jury. See *Ex parte Williams,* 556 So. 2d 744, 745 (Ala. 1987). Unless the jury played a key role, so goes the argument, reversal would not be warranted because the sentencing judge was not exposed to the same harmful error. The flaw in this contention is that reversal is proper so long as the jury recommendation plays a role in the judge's decision, not necessarily a determinative one. If the judge must consider the jury verdict in sentencing a capital defendant, as the statute plainly requires, then it follows that a sentence is invalid if the recommendation upon which it partially rests was rendered erroneously. In *Espinosa* v. *Florida,* 505 U. S. 1079 (1992), the advisory jury, but not the sentencing

judge, was presented with an invalid aggravating factor. We summarily reversed the death sentence, explaining that "Florida has essentially split the weighing process in two. Initially, the jury weighs aggravating and mitigating circumstances, and the result of that weighing process is then in turn weighed within the trial court's process of weighing aggravating and mitigating circumstances." *Id.*, at 1082. Error is committed when the jury considers an invalid factor and its verdict is in turn considered by the judge: "This kind of indirect weighing of an invalid aggravating factor creates the same potential for arbitrariness as the direct weighing of an invalid aggravating factor, and the result, therefore, was error." *Ibid.* (citation omitted). Such consequential error attaches whenever the jury recommendation is considered in the process, not only when it is given great weight by the judge.

We have observed in the Florida context that permitting the trial judge to reject the jury's advisory verdict may afford capital defendants "a second chance for life with the trial judge," *Dobbert*, 432 U. S., at 296. In practice, however, Alabama's sentencing scheme has yielded some ostensibly surprising statistics. According to the Alabama Prison Project, there have been only 5 cases in which the judge rejected an advisory verdict of death, compared to 47 instances where the judge imposed a death sentence over a jury recommendation of life. Statistics compiled by the Alabama Prison Project (Nov. 29, 1994) (lodged with the Clerk of this Court). But these numbers do not tell the whole story. We do not know, for instance, how many cases in which a jury recommendation of life imprisonment is adopted would have ended differently had the judge not been required to consider the jury's advice. Without such a subjective look into the minds of the decisionmakers, the deceptively objective numbers afford at best an incomplete picture. Even assuming that these statistics reflect a true view of capital sentencing in Alabama, they say little about

whether the scheme is constitutional. That question turns not solely on a numerical tabulation of actual death sentences as compared to a hypothetical alternative, but rather on whether the penalties imposed are the product of properly guided discretion and not of arbitrary whim. If the Alabama statute indeed has not had the effect that we or its drafters had anticipated, such unintended results would be of little constitutional consequence. An ineffectual law is for the state legislature to amend, not for us to annul.

Harris draws our attention to apparent disparities in the weight given to jury verdicts in different cases in Alabama. For example, the trial judge here did not specify his reason for rejecting the jury's advice but in another case wrote that he accorded "great weight" to the recommendation, *State* v. *Coral*, No. CC–88–741 (Montgomery Cty., June 26, 1992), Alabama Capital Sentencing Orders, p. 72 (lodged with the Clerk of this Court). In rejecting the jury verdict, other judges have commented variously that there was a "reasonable basis" to do so, *State* v. *Parker*, No. CC–88–105 (Colbert Cty., Dec. 3, 1991), Alabama Capital Sentencing Orders, at 408, that the verdict was "unquestionably a bizarre result," *Ex parte Hays*, 518 So. 2d 768, 777 (Ala. 1986), or that "if this were not a proper case for the death penalty to be imposed, a proper case can scarcely be imagined," *State* v. *Frazier*, No. CC–85–3291 (Mobile Cty., July 31, 1990), Alabama Capital Sentencing Orders, at 139. Juxtaposing these statements, Harris argues that the Alabama statute permits judges to reject arbitrarily the advisory verdict, thereby abusing their sentencing discretion.

But these statements do not indicate that the judges have divergent understandings of the statutory requirement that the jury verdicts be considered; they simply illustrate how different judges have "considered" the jury's advice. There is no reason to expect that the advisory verdicts will be treated uniformly in every case. The Alabama statute provides that the weighing process "shall not be defined to mean

a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison," Ala. Code § 13A–5–48 (1994), which is no less than what the Constitution requires, see *Proffitt*, 428 U. S., at 258 (joint opinion of Stewart, Powell, and STEVENS, JJ.). The disparate treatment of jury verdicts simply reflects the fact that, in the subjective weighing process, the emphasis given to each decisional criterion must of necessity vary in order to account for the particular circumstances of each case. See *Eddings* v. *Oklahoma*, 455 U. S., at 112 ("[A] consistency produced by ignoring individual differences is a false consistency"). In any event, Harris does not show how the various statements affect her case. She does not bring an equal protection claim, and she does not contest the lower courts' conclusion that her sentence is proportionate to that imposed in similar cases. The sentiments expressed in unrelated cases do not render her punishment violative of the Eighth Amendment.

The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight. Accordingly, we affirm the judgment of the Alabama Supreme Court.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

Alabama's capital sentencing statute is unique. In Alabama, unlike any other State in the Union, the trial judge has unbridled discretion to sentence the defendant to death—even though a jury has determined that death is an inappropriate penalty, and even though no basis exists for believing that any other reasonable, properly instructed jury would impose a death sentence. Even if I accepted the reasoning of *Spaziano* v. *Florida*, 468 U. S. 447, 457–465 (1984), which I do not, see *id.*, at 467 (STEVENS, J., concurring in part and dissenting in part), I would conclude that the com-

plete absence of standards to guide the judge's consideration of the jury's verdict renders the statute invalid under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.

I

Our opinions have repeatedly emphasized that death is a fundamentally different kind of penalty from any other that society may impose.[1] State legislatures' assignments of sentencing authority exemplify the distinction. In every State except Oklahoma, the trial judge rather than the jury is responsible for sentencing in noncapital cases. The opposite consensus, however, prevails in capital cases. In 33 of the 37 States that authorize capital punishment, the jury participates in the sentencing decision. In 29 of those States, the jury's decision is final; in the other 4—Alabama, Delaware, Florida, and Indiana—the judge has the power to override the jury's decision. Russell, The Constitutionality of Jury Override in Alabama Death Penalty Cases, 46 Ala. L. Rev. 5, 9–10 (1994). Thus, 33 of the 37 state legislatures that have enacted death penalty statutes have given the jury sentencing responsibilities that differ from the prevailing view of the jury's role in noncapital cases. The Federal Government also provides for jury sentencing in capital cases.[2]

These legislative decisions reflect the same judgment expressed in England in 1953 after a 4-year study by the Royal Commission on Capital Punishment:

"The question whether there are grounds for relieving the prisoner from the liability to be sentenced to death

---

[1] See, *e. g., Lankford* v. *Idaho,* 500 U. S. 110, 125 (1991); *Clemons* v. *Mississippi,* 494 U. S. 738, 750, n. 4 (1990); *Booth* v. *Maryland,* 482 U. S. 496, 509, n. 12 (1987); *Solem* v. *Helm,* 463 U. S. 277, 289, 294 (1983); *Enmund* v. *Florida,* 458 U. S. 782, 797 (1982); *Beck* v. *Alabama,* 447 U. S. 625, 637–638 (1980); *Gardner* v. *Florida,* 430 U. S. 349, 357–358 (1977) (plurality opinion).

[2] See Violent Crime Control and Law Enforcement Act of 1994, 108 Stat. 1966–1967.

is a question of quite a different order from the question whether he should serve a shorter or a longer term of imprisonment, and involves much deeper moral and social issues. The lesson of history is that, when a criminal offence is punishable by death, in practice juries will not confine their attention to the issue of guilt and ignore the sentence which conviction entails. In the past, British juries, by perverse verdicts and by petitions, did at least as much as the campaigns of the reformers to bring the law into conformity with the developing moral conceptions of the community, especially in the field of capital punishment. It may well be argued that the men and women of the jury may be regarded as a microcosm of the community, who will reflect the changing attitudes of society as a whole to the infliction of capital punishment, and that there could therefore be no more appropriate body to decide whether the fellow-citizen whom they have found guilty of murder should suffer the penalty of death prescribed by the law or should receive a lesser punishment." Royal Commission on Capital Punishment 1949–1953, Report 200 (1953).

In ordinary, noncapital sentencing decisions, judges consider society's interests in rehabilitating the offender, in incapacitating him from committing offenses in the future, and in deterring others from committing similar offenses. In capital sentencing decisions, however, rehabilitation plays no role; incapacitation is largely irrelevant, at least when the alternative of life imprisonment without possibility of parole is available;[3] and the assumption that death provides a greater deterrent than other penalties is unsupported by

---

[3] In *Gregg* v. *Georgia,* 428 U. S. 153 (1976), although we noted that incapacitation had been advanced as a rationale for upholding the death penalty, *id.,* at 183, n. 28 (joint opinion of Stewart, Powell, and STEVENS, JJ.), the joint opinion placed no reliance on incapacitation as an acceptable justification. See *California* v. *Ramos,* 463 U. S. 992, 1023, and n. 9 (1983) (Marshall, J., dissenting).

persuasive evidence.[4] Instead, the interest that we have identified as the principal justification for the death penalty is retribution: "[C]apital punishment is an expression of society's moral outrage at particularly offensive conduct." *Gregg* v. *Georgia*, 428 U. S. 153, 183 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.); see Gillers, Deciding Who Dies, 129 U. Pa. L. Rev. 1, 54–56 (1980). A capital sentence expresses the community's judgment that no lesser sanction will provide an adequate response to the defendant's outrageous affront to humanity. *Gregg*, 428 U. S., at 184. A representative cross section of the community should bear the responsibility to "express the conscience of the community on the ultimate question of life or death" in particular cases. *Witherspoon* v. *Illinois*, 391 U. S. 510, 519 (1968) (footnote omitted). An expression of community outrage carries the legitimacy of law only if it rests on fair and careful consideration, as free as possible from passion or prejudice. Although the public's apparent zeal for legislation authorizing capital punishment might cast doubt on citizens' capacity to apply such legislation fairly, I am convinced that our jury system provides reliable insulation against the passions of the polity. Voting for a political candidate who vows to be "tough on crime" differs vastly from voting at the conclusion of an actual trial to condemn a specific individual to death. Jurors' responsibilities terminate when their case ends; they answer only to their own consciences; they rarely have any concern about possible reprisals after their work is done. More importantly, they focus their attention on a particular case involving the fate of one fellow citizen, rather than on a generalized remedy for a global category of faceless violent criminals who, in the abstract, may appear unworthy of life. A jury verdict expresses a collective judg-

---

[4] See, *e. g.*, *Spaziano* v. *Florida*, 468 U. S. 447, 478–479 (1984) (STEVENS, J., concurring in part and dissenting in part); H. Zeisel, The Limits of Law Enforcement 60–63 (1982); Gillers, Deciding Who Dies, 129 U. Pa. L. Rev. 1, 49–54 (1980).

ment that we may fairly presume to reflect the considered view of the community.

The Constitution does not permit judges to determine the guilt or innocence of an accused without her consent. The same reasons that underlie that prohibition apply to life-or-death sentencing decisions. The Framers of our Constitution "knew from history and experience that it was necessary to protect . . . against judges too responsive to the voice of higher authority." *Duncan* v. *Louisiana,* 391 U. S. 145, 156 (1968). As we explained in *Duncan:*

> "[T]he jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence." *Ibid.*

Community participation is as critical in life-or-death sentencing decisions as in those decisions explicitly governed by the constitutional guarantee of a jury trial. The "higher authority" to whom present-day capital judges may be "too responsive" is a political climate in which judges who covet higher office—or who merely wish to remain judges—must constantly profess their fealty to the death penalty.[5] Ala-

---

[5] This climate is evident in political attacks on candidates with reservations about the death penalty. For example, challengers for United States Senate seats in the recent elections routinely savaged their incumbent opponents for supporting federal judicial nominees perceived to be "soft" on capital punishment. See, *e. g.,* Lehigh & Phillips, Romney, Kennedy Air Another Round of Attack Ads, Boston Globe, Oct. 31, 1994, Metro/Region section, p. 21; Lesher, Huffington Attacks Rival on Judges, Los Angeles Times, Sept. 30, 1994, p. A3; Political Notebook, Memphis Commercial Appeal, Oct. 8, 1994, p. 3B (Frist-Sasser race). Some Senators have also made the death penalty a litmus test in judicial confirmation

bama trial judges face partisan election every six years. Ala. Code § 17–2–7 (1987). The danger that they will bend to political pressures when pronouncing sentence in highly publicized capital cases is the same danger confronted by judges beholden to King George III.

## II

In my opinion, total reliance on judges to pronounce sentences of death is constitutionally unacceptable. See *Walton* v. *Arizona,* 497 U. S. 639, 708 (1990) (STEVENS, J., dissenting). While the addition of an advisory jury may ameliorate concerns about judicial sentencing in some cases, more often that addition makes the scheme much worse, especially when, as in Alabama, the jury's verdict carries no necessary weight.

If Alabama's statute expressly provided for a death sentence upon a verdict by *either* the jury or the judge, I have no doubt it would violate the Constitution's command that no defendant "be twice put in jeopardy of life or limb." U. S. Const., Amdt. 5; cf. *Bullington* v. *Missouri,* 451 U. S. 430, 444–446 (1981). The Alabama scheme has the same practical effect. As the Court recognizes, *ante,* at 513, Alabama trial judges almost always adopt jury verdicts recommending death; a prosecutor who wins before the jury can be confident that the defendant will receive a death sentence. A prosecutor who loses before the jury gets a second, fresh opportunity to secure a death sentence. She may present the judge with exactly the same evidence and arguments

hearings. See, *e. g.,* Lewis, G. O. P. To Challenge Judicial Nominees Who Oppose Death Penalty, N. Y. Times, Oct. 15, 1993, p. A26; Vick, Barkett's Foes Show Strength Even in Defeat, St. Petersburg Times, Mar. 18, 1994, p. 5B. As one commentator has written: "Most experts on penal systems agree that capital punishment does not deter capital crime. But the public believes that it does, and politicians have been switching longstanding positions to accommodate that view. . . . This . . . is the democratic system." Wills, Read Polls, Heed America, N. Y. Times, Nov. 6, 1994, section 6 (magazine), p. 48.

that the jury rejected. The defendant's life is twice put in jeopardy, once before the jury and again in the repeat performance before a different, and likely less sympathetic, decisionmaker. A scheme that we assumed would "provid[e] capital defendants with more, rather than less, judicial protection," *Dobbert* v. *Florida,* 432 U. S. 282, 295 (1977),[6] has perversely devolved into a procedure that requires the defendant to stave off a death sentence at each of two *de novo* sentencing hearings.

Not surprisingly, given the political pressures they face, judges are far more likely than juries to impose the death penalty. This has long been the case,[7] and the recent experience of judicial overrides confirms it. Alabama judges have vetoed only five jury recommendations of death, but they have condemned 47 defendants whom juries would have spared.[8] The Court acknowledges this "ostensibly surpris-

---

[6] I have always believed the legislative decision to authorize an override was intended to protect the defendant from the risk of an erroneous jury decision to impose the death penalty. See *Proffitt* v. *Florida,* 428 U. S. 242, 252–253 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.). States have in the past argued that the override would serve to protect defendants. See, *e. g.,* Brief for Respondent in *Dobbert* v. *Florida,* O. T. 1976, No. 76–5306, p. 17 ("It cannot be said that Florida's new [override] procedure reduces the possibility of mercy. In fact, it is enhanced").

[7] See H. Zeisel, Some Data on Juror Attitudes Towards Capital Punishment 37–50 (1968).

[8] Statistics from Florida and Indiana confirm that judges tend to override juries' life recommendations far more often than their death recommendations. Between 1972 and early 1992, Florida trial judges imposed death sentences over 134 juries' recommendations of life imprisonment. See Radelet and Mello, Death-to-Life Overrides: Saving the Resources of the Florida Supreme Court, 20 Fla. St. U. L. Rev. 195, 196 (1992). During the same period, Florida judges overrode only about 51 death recommendations. *Id.,* at 210–211. In Indiana, between 1980 and early 1994, judges had used overrides to impose eight death sentences and only four life sentences. Memorandum from Paula Sites, Legal Director, Indiana Public Defender Council, to Supreme Court Library (Feb. 8, 1994) (lodged with the Clerk of this Court). The even more extreme disparity in Alabama may well be attributable to Alabama's unique failure to adopt the

ing" fact, *ante*, at 513, but dismisses it as inconclusive, because "[w]e do not know . . . how many cases in which a jury recommendation of life imprisonment is adopted would have ended differently had the judge not been required to consider the jury's advice," *ibid.* This attempt to shrug off the reality of Alabama capital sentencing misses the point. Perhaps Alabama judges would be even more severe, and their sentences even more frequently inconsistent with the community's sense of justice, if Alabama provided for no jury verdicts at all. But the proper frame of reference is not a sentencing scheme with no jury; rather, it is a sentencing scheme with no judge—the scheme maintained by 29 of 37 States with capital punishment. In that comparison, the fact that Alabama trial judges have overridden more than nine juries' life recommendations for every vetoed death recommendation is conclusive indeed. Death sentences imposed by judges, especially against jury recommendations, sever the critical "link between contemporary community values and the penal system." *Witherspoon*, 391 U. S., at 519, n. 15. They result in the execution of defendants whom the community would spare.

Death sentences imposed by judges over contrary jury verdicts do more than countermand the community's judgment: They express contempt for that judgment. Judicial overrides undermine the jury system's central tenet that "sharing in the administration of justice is a phase of civic responsibility." *Thiel* v. *Southern Pacific Co.*, 328 U. S. 217, 227 (1946) (Frankfurter, J., dissenting). Overrides also sacrifice the legitimacy of jury verdicts, at potentially great cost. Whereas the public presumes that a death sentence imposed by a jury reflects the community's judgment that death is the appropriate response to the defendant's crime, the same presumption does not attach to a lone government

---

more stringent standard that governs overrides in the other States. See *infra*, at Part III.

official's decree. Indeed, government-sanctioned executions unsupported by judgments of a fair cross section of the citizenry may undermine respect for the value of human life itself and unwittingly increase tolerance of killing.[9] As Justice Brandeis reminded us, "Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious." *Olmstead* v. *United States*, 277 U. S. 438, 485 (1928) (dissenting opinion). Unless the imposition of the death penalty consistently rests on the most scrupulous regard for fair procedure and the application of accepted community standards, it may well teach a lesson that aggravates the very dangers it was intended to deter.

---

[9] Research has provided evidence that executions actually increase the level of violence in society. For example, a controlled, 56-year study in New York State revealed that an average of two additional homicides occurred in the month following an execution. See Bowers & Pierce, Deterrence or Brutalization: What Is the Effect of Executions?, 26 Crime and Delinquency 453 (1980). A 10-year study in California produced less conclusive but similar results. See Graves, The Deterrent Effect of Capital Punishment in California, in The Death Penalty in America 322, 327–331 (H. Bedau ed. 1967). Experienced prosecutors recognize this reality. Morgenthau, What Prosecutors Won't Tell You, N. Y. Times, Feb. 7, 1995, p. A25 ("[B]y their brutalizing and dehumanizing effect on society, executions cause more murders than they prevent"). A court's unilateral decree of a death sentence surely magnifies the risk of such perverse consequences. This Court's recent refusal to stay an execution provides an illustration. After a jury had sentenced the defendant, the prosecutor announced that a different person had pulled the trigger. Nevertheless, the State executed the condemned man without giving him a chance to present this information to a jury. See *Jacobs* v. *Scott, post,* at 1067 (STEVENS, J., dissenting from denial of stay of execution). Six days later, a news account described death penalty supporters' lack of concern about the danger of executing innocent people. "One [proponent of capital punishment] likened the death penalty to a childhood vaccine approved by the government with full knowledge that at least one child, somewhere, would die from an adverse reaction." Verhovek, When Justice Shows Its Darker Side, N. Y. Times, Jan. 8, 1995, section 4, p. 6.

## III

If the Court correctly held in *Spaziano* that the Constitution's concerns with regularity and fairness do not bar judges from imposing death sentences over contrary jury verdicts, one would at least expect the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to require that such schemes maintain strict standards to regularize and constrain the judge's discretion. The Court today refuses to impose any standard, holding that to do so would be "micromanagement." *Ante*, at 512. But this case involves far more than a mundane administrative detail.

Alabama stands alone among the States in its refusal to constrain its judges' power to condemn defendants over contrary jury verdicts. The Florida statute upheld in *Spaziano*, as interpreted by the Florida Supreme Court, requires the prosecutor to satisfy a more stringent standard before the judge than before the jury, prohibiting a judicial override unless the facts supporting the death sentence are "so clear and convincing that virtually no reasonable person could differ." *Tedder* v. *State*, 322 So. 2d 908, 910 (1975). If that standard is satisfied, a judge may rationally presume that the jury's verdict did not fairly reflect the judgment of the community. Delaware and Indiana impose similar requirements for overrides. See *Pennell* v. *State*, 604 A. 2d 1368, 1377–1378 (Del. 1992); *Martinez-Chavez* v. *State*, 534 N. E. 2d 731, 735 (Ind. 1989).

We have repeatedly cited the *Tedder* standard with approval, suggesting that the Constitution requires such a constraint on a jury override provision. See *Spaziano*, 468 U. S., at 465; *Dobbert* v. *Florida*, 432 U. S., at 294–295; *Proffitt* v. *Florida*, 428 U. S. 242, 252 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). Today the Court dismisses those statements. After Justice Blackmun stated in his opinion for the Court in *Spaziano* that "[w]e are satisfied that the Florida Supreme Court takes *[Tedder]* seriously

and has not hesitated to reverse a trial court if it derogates the jury's role," he added, as the majority notes, that "[o]ur responsibility, however, is not to second-guess the deference accorded the jury's recommendation in a particular case, but to ensure that the result of the process is not arbitrary or discriminatory." 468 U. S., at 465. The majority reads this second statement to mean that "the hallmark of the analysis is not the particular weight a State chooses to place upon the jury's advice." *Ante*, at 511. That reading is overly ambitious at best. The question whether the Constitution requires the *Tedder* rule goes squarely to "the result of the process." The *Spaziano* Court declined to upset the result in the "particular case" before it based on the way the Florida Supreme Court had applied *Tedder* in that case. It did not announce that it would have reached the same result had Florida abjured *Tedder* entirely; rather, it appears to have made *Tedder*'s role in the Florida scheme a necessary consideration in its evaluation of Florida overrides. The Court's reading of Justice Blackmun's opinion in *Spaziano* is tenable, but a more likely reading is that his opinion meant to echo our previous suggestions that a jury override scheme is unconstitutional without *Tedder*.

I would follow those suggestions and recognize *Tedder* as a constitutional imperative. As I have explained, an unfettered judicial override of a jury verdict for life imprisonment cannot be taken to represent the judgment of the community. A penalty that fails to reflect the community's judgment that death is the appropriate sentence constitutes cruel and unusual punishment under our reasoning in *Gregg*. Remarkably, the Court attempts to bolster its holding by citing our reversal of a Florida death sentence for error before the advisory jury. *Ante*, at 512–513, citing *Espinosa* v. *Florida*, 505 U. S. 1079 (1992). The Court forgets that the difference between Florida and Alabama is precisely what is at stake in this case. The Constitution compelled *Espinosa* for the

same ultimate reason it compels *Tedder:* The community's undistorted judgment must decide a capital defendant's fate.[10] Proper attention to *Espinosa* would lead the Court to reject the conclusion it reaches today.

In reaching its result the Court also fails to consider our longstanding principle that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958). The *Spaziano* Court held that the rejection of capital jury sentencing by all but seven States, and of capital jury overrides by all but (at that time) three, did not demonstrate an "evolving standard" disfavoring overrides. *Spaziano,* 468 U. S., at 463–464. Surely, however, the rejection of standardless overrides by every State in the Union but Alabama is a different matter. Cf. *Enmund* v. *Florida,* 458 U. S. 782, 789–793 (1982).

The Court today casts a cloud over the legitimacy of our capital sentencing jurisprudence. The most credible justification for the death penalty is its expression of the community's outrage. To permit the State to execute a woman in spite of the community's considered judgment that she should not die is to sever the death penalty from its only legitimate mooring. The absence of any rudder on a judge's free-floating power to negate the community's will, in my judgment, renders Alabama's capital sentencing scheme fundamentally unfair and results in cruel and unusual punishment. I therefore respectfully dissent.

---

[10] Of course, the majority is correct to reaffirm the importance of remedying prejudicial error before advisory juries. When the Court next has occasion to review an Alabama jury-related error and the sentencing judge has not revealed the degree of her reliance on the jury's advice, the majority apparently will be content to presume that the error, and the jury decision it tainted, mattered to the result.