*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0052p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BILLY SLAGLE,

*Petitioner-Appellant,*

*v.*

No. 04-3490

MARGARET BAGLEY, Warden,

*Respondent-Appellee.*

---

Filed: February 2, 2007

Before: BOGGS, Chief Judge; MOORE and ROGERS, Circuit Judges.

---

## ORDER

---

The court having received a petition for rehearing en banc, and the petition having been circulated not only to the original panel members but also to all other active [*] judges of this court, and less than a majority of the judges having favored the suggestion, the petition for rehearing has been referred to the original panel.

The panel has further reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision of the case. Accordingly, the petition is denied.

---

[*] Judge Cook recused herself from participation in this ruling.

1

BOGGS, Chief Judge, concurring in denial of rehearing en banc. Because dissents from our court's denial of rehearings en banc are quite rare, the lack of any countering views at the time of such a dissent may be taken to mean that the contrary views presented are unanswerable.

Instead, it is usually the case that the original opinion has carefully considered and answered any substantive points made in the dissent from denial of rehearing en banc.[1]

So it is in this case. Judge Rogers's excellent opinion carefully applied existing law with respect to analyzing statements, made during the course of a long and contentious trial, that may be characterized as improper statements by a prosecutor. The law never has been, in a capital case or otherwise, that every or even multiple prosecutorial errors, objected to or not, cured or not, can bring a grant of habeas corpus in federal court, years or decades down the road. Instead, the law prescribes a method for analyzing the import, motive, frequency, and prejudice from any such remarks, which is exactly what Judge Rogers's opinion did, and that opinion fully answers the substantive portion of the dissents. *See Slagle v. Bagley* 457 F 3d 501, 514-28 (6th Cir. 2006).

---

[1](*See, e.g.,* the dissent from denial of rehearing en banc in *Slaughter v. Parker*, which focuses wholly on a characterization of the defendant's mental condition that goes far beyond  argument made by the dissenting panel member when the issue was considered in the panel opinion. *Compare* the panel dissent's focusing, correctly, only on tentative evidence of possible mental effects of past physical skull injury, ("may have suffered from brain damage"; "if [hematoma existed] . . . could have resulted in brain damage") 450 F. 3d 224, 249, 250 (6th Cir. 2006) *with* dissent from denial of rehearing en banc ("likely brain-damaged "; "likely suffered brain damage").
467 F. 3d 511, 513, 514 (6th Cir. 2006).

KAREN NELSON MOORE, Circuit Judge, dissenting from denial of rehearing en banc. I dissent from the court's denial of rehearing en banc for the reasons expressed in my dissenting opinion in *Slagle v. Bagley*, 457 F.3d 501, 529 (6th Cir. 2006).

BOYCE F. MARTIN, JR., Circuit Judge, dissenting from denial of rehearing en banc. I fully join Judge Moore's thorough dissent from the panel opinion, and write separately only to underscore what I view as a systemic problem fostered by capital punishment that is highlighted by this case. Any student or practitioner of the law — indeed, any casual viewer of *Law & Order* — would find it obvious that the repeated, unduly prejudicial comments of the prosecutor in this case were highly improper. And yet an attorney not only admitted to practice in Ohio, and not only employed by the state prosecutor's office, but charged with the duty to prosecute a criminal trial with the highest possible stakes, found it appropriate to repeatedly make such comments. Further, the state trial judge, who is entrusted with profound Constitutional responsibilities, presided over a trial where these comments were made over and over again. The debasement of the ethical code of our profession and the rules of evidence and procedure that occurred at Slagle's trial are emblematic of how the politicization of the death penalty has undermined the administration of criminal law in this country.

The Ohio Code of Professional Responsibility provides that the "responsibility of a public prosecutor differs from that of the usual advocate," in that "his duty is to *seek justice, not merely to convict*." Ohio Code of Prof. Resp., EC 7-13 (emphasis added). More specifically, the Disciplinary Rules prohibit every lawyer from "assert[ing] his personal opinion as to the justness of a cause, as to the credibility of a witness, . . . or as to the guilt or innocence of an accused." *Id*. at DR 7-106(C)(4). Further, a lawyer "shall not . . . [i]ntentionally or habitually violate any established rule of procedure or evidence." *Id*. at DR 7-106(C)(7). An attorney is prohibited from referring to facts "that will not be supported by admissible evidence," or "ask[ing] any question that he has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness or other person." *Id*. at DR 7-106(C)(1), (2). In the trial of Billy Slagle, the prosecutor indisputably violated these obligations — and likely did so intentionally — thus betraying not only his ethical duty to his office and his profession, but to the citizens of Ohio who elected him.

According to the majority, no less than *fifteen* comments made by the prosecutor were improper. *Slagle v. Bagley*, 457 F.3d 501, 514 (6th Cir. 2006). The prosecutor consistently assaulted Slagle's character by repeatedly suggesting that the murder was motivated by religious animus, *id*. at 518, and unnecessarily opining that Slagle represented one of the "greatest threats against community and civilization as we know it." *Id*. at 529 (Moore, J., dissenting). He violated the rule against making references to facts outside of the record, by insinuating without any basis, for example, that Slagle would have harmed the children if they had woken up. *Id*. at 510. The prosecutor unethically denigrated a defense expert witness by labeling his testimony as "liberal quack theories . . . ." *Id*. at 522. Further, he vouched for prosecutorial witnesses with comments like "I do very much stand behind the police work." *Id*. at 523.

A prosecutor who diligently attempts to promote justice by fairly presenting his case and relying on relevant evidence and testimony may have a harder task ahead of him than one who uses irrelevant and vitriolic attacks to win the jury's vote. Yet the ethical duties of his profession require that he follow the former path rather than the latter. Such misleading comments and insults hindered the jury's ability in this case to properly perform its truth-finding function. Prosecutors who employ such tactics abuse the trust of jurors, who naturally rely on the candor of prosecutors when making determinations of guilt.

This type of prosecutorial misconduct is in no small way influenced by public opinion, for prosecutors depend on votes to maintain their positions. Unfortunately, a public official may be given an incentive to abuse his power and disregard his ethical obligations when his livelihood is dependent upon public approval. And the frequent and overzealous pursuit of the death penalty — not only as a medium by which to gain publicity, but to earn favorable standing in the public eye — is a vehicle used by prosecutors to garner votes in the next election. Sadly, some prosecutors, such as the one in Slagle's case, have allowed the incentives of political gain to trump their duties of

professional responsibility. As scholars have noted, an announcement that the death penalty will be sought "provides an opportunity for a prosecutor to obtain news coverage and ride popular sentiments that almost any politician would welcome." Stephen B. Bright & Patrick J. Keenan, *Judges and the Politics of Death: Deciding Between the Bill of Rights and the Next Election in Capital Cases*, 75 B.U. L. REV. 760, 781 (1995). While a noncapital trial or case resolved by guilty plea will not receive a great deal of media coverage, "[a] capital trial provides one of the greatest opportunities for sustained coverage on the nightly newscasts and in the newspapers." *Id.* Prosecutors are by no means unmindful of the political advantage gained by capitalizing on the number of death sentences they secure. *See, e.g.* Kenneth Bresler, *Seeking Justice, Seeking Election, and Seeking the Death Penalty: The Ethics of Prosecutorial Candidates' Campaigning on Capital Convictions*, 7 GEO. J. LEGAL ETHICS 941, 945 (1993-94) (providing a print advertisement of a North Carolina district attorney's reelection campaign, in which he listed the defendants whom he had convicted of first degree murder and the sentences they received). Although a prosecutor is entitled to advocate his case with zeal, the intentional sensationalization of a trial does a great disservice to the values of the legal profession and the administration of justice.

Ohio's criminal justice system is only degraded by prosecutors who continue to disregard the ethical duties of the legal profession in order to increase their "batting average" of death sentences and other convictions. Through this practice prosecutors are enabled to state that they are "tough on crime," allowing them to secure more votes, remain in office, and continue their conviction-oriented (rather than justice-oriented) approach. The desire to pander to public opinion has apparently become a "higher authority" for some prosecutors than their duty to follow their code of professional responsibility. *See Harris v. Alabama*, 513 U.S. 504, 519 (1995) (Stevens, J., dissenting) (referring to the political pressures faced by elected state court judges). Such a self-perpetuating vicious cycle can only be stymied if Ohio's Code of Professional Responsibility is actually enforced. Lawyers must uphold their pledge to report violations,[1] and prosecutors who abuse our system of justice by disregarding ethical rules for their own self-interest must be sanctioned appropriately.

Although I focus my discussion on the prosecutor's unethical — if not unconscionable — misconduct, I also note that the judge who presided over this case is not immune from blame. Ohio's policy of electing judges subjects them to the same political pressures that affect prosecutors. As Justice Stevens has noted, "capital judges may be 'too responsive' [to] a political climate in which judges who covet higher office — or who merely wish to remain judges — must constantly profess their fealty to the death penalty." *Harris*, 513 U.S. at 519 (Stevens, J., dissenting). The impact of such a political climate may well be reflected in this trial judge's laissez faire attitude, most notably evidenced by his failure to control the prosecutor's frequent use of inflammatory comments to which the defense did not object.

So long as the Supreme Court deems the death penalty to be permissible under the Constitution, and so long as prosecutors and state court judges are subject to political pressure to be "tough on crime" and pro-death penalty, the politicization of the death penalty will only accelerate. As Justice Frankfurter aptly stated, "[w]hen life is at hazard in a trial, it sensationalises the whole thing almost unwittingly; the effect . . . [is] very bad." James S. Liebman, *The Overproduction of Death*, 100 COLUM. L. REV. 2030, 2082 (2000) (quoting Felix Frankfurter, OF LAW AND MEN 81 (1956)). This sensationalization is at odds with the Constitutional guarantee of a fair trial, and all members of the legal profession — lawyers and judges alike — have an ongoing duty to combat it.

---

[1] *See* Ohio Code of Prof. Resp., EC 1-4 (providing that lawyers should bring to the attention of officials all unprivileged knowledge of conduct of lawyers that is clearly in violation of the Disciplinary Rules). *See also* David Barstow & Duff Wilson, *Prosecutor in Duke Sexual Assault Case Faces Ethics Complaint From State Bar*, N.Y. TIMES, Dec. 15, 2006 at A22 (reporting that the North Carolina State Bar filed a formal ethics complaint against Durham prosecutor Michael B. Nifong for reasons including improper commentary about the defendants and evidence).

        In light of the repeated, prejudicial instances of prosecutorial misconduct, I believe en banc review is warranted to correct the injustice in this case.

ENTERED BY ORDER OF THE COURT


/s/ Leonard Green
_____
                        Clerk