[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 92 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 93 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 94 
The appellant, Vernon Madison, was convicted of two counts of capital murder in the death of Julius Schulte, see § 13A-5-40
(a)(5), Code of Alabama 1975. The first count charged the appellant with killing a police officer who was on duty, and the second charged him with killing a police officer who was performing an official or job-related act. Following the sentencing hearing, the appellant was sentenced to death. His conviction and sentence subsequently were reversed, 545 So.2d 91
(Ala.Crim.App. 1987), and the case was retried. A second conviction and sentence of death also were reversed, 620 So.2d 62
(Ala.Crim.App. 1992), and the appellant was tried for the third time. The jury again found the appellant guilty of capital murder and recommended that he be sentenced to life imprisonment without the possibility of parole, with eight jurors voting for life imprisonment without parole and four voting for death by electrocution. After a hearing before the trial court, the court sentenced the appellant to death by electrocution.
The facts of this case, as set out by the trial court, are as follows:
 "That on April 18, 1985, the residents of 1058 Etta Avenue were Cheryl Green,[1] the woman with whom the Defendant had lived until days prior to the murder, and Kimberly Hughes, her 11-year-old daughter.
 "That night, Cpl. Julius Schulte, a police officer of the City of Mobile, was dispatched and went to 1058 Etta Avenue in Mobile to investigate a missing child complaint.
 "When Cpl. Schulte arrived, he learned that the child, Kimberly Hughes, had come home after her mother called the police but before he arrived. He also found himself in the midst of a domestic dispute between Cheryl Green and the Defendant, for April 18, 1985, was also the night that Green had thrown the Defendant's personal effects out of the house they previously shared.
 "The Defendant had come and gone from 1058 Eitta Avenue before Cpl. Schulte arrived, ostensibly to look for Kimberly. He came back with another woman, Mary McCord, after Cpl. Schulte was on the scene, but he left her and his .32 caliber pistol at the corner before proceeding to the house located in the middle of the block.
 "Once inside the 1058 Etta Avenue residence, the Defendant argued with Green, accusing her of calling the police on him. Even though he now knew the child was secure, Cpl. Schulte remained on the scene and called for a backup officer, because he had been asked to stay until Green and her child were safely away from the Defendant.
 "The Defendant and Green came out of the house, and both talked to Cpl. Schulte, who never exited his patrol car. After that brief conversation, the defendant appeared to leave. He did not go far; rather, he simply went to the corner where Mary McCord was holding his .32 caliber pistol. He took the gun from her and left her.
 "Now armed, the Defendant went back to where Green was still talking with Cpl. Schulte, who still sat innocently and unsuspectingly in his unmarked police car. The Defendant, however, returned a different way. He went over one block, and he sneaked up behind the houses on Etta Avenue. He emerged from the shadows, approached Cpl. Schulte from the left rear, and coldly and methodically fired two shots at near point blank range into the back of Cpl. Schulte's head. He then turned the weapon on Cheryl Green, shooting her in the back. After killing his helpless victim. Cpl. Schulte, and shooting Cheryl Green, the Defendant fled the scene." *Page 95 
 I.
The appellant contends that the indictment improperly charged two counts of capital murder for a single offense. He argues that presenting § 13A-5-40(a)(5), Code of Alabama 1975, as two exposed him to double jeopardy, enhanced his punishment, and deprived him of constitutional protections. He further argues that, because the jury verdict form does not reflect the count on which he was convicted, the jury may have found him guilty of what it believed were two offenses or may not unanimously have found him guilty of one offense. In addition, he argues, the jury could have found him more deserving of death because he had been convicted of two offenses rather than one.
The first count of the appellant's indictment charged him with the intentional shooting of Julius Schulte while Schulte was "on duty as a police officer"; the second count charged that the shooting occurred while Schulte was "performing an official or job related act." Both counts are alternative methods of proving a single offense. See § 13A-5-40(a)(5), Code of Alabama 1975. The trial court instructed the jury that there were "two counts contained in the indictment, each charging the Defendant with a capital offense," and stated that, if the jurors were not convinced that the state had proven "each of the essential elements of either of the capital offenses beyond reasonable doubt," they should find the appellant not guilty of "the capital offense as charged in the indictment" and consider the lesser included offense of murder. The court further instructed the jury that, if it found the appellant guilty of "the capital felony as charged in the indictment," it would not be necessary to state the count or counts of the indictment on which they found him guilty. The jury subsequently returned a verdict form that stated, "We, the July, find the Defendant guilty of the capital felony as charged in the indictment." The trial court thereafter sentenced the appellant to death by electrocution.
In Floyd v. State, 486 So.2d 1309 (Ala.Cr.App. 1984), aff'd,486 So.2d 1321 (Ala. 1986), cert. denied, 479 U.S. 1101,107 S.Ct. 1328, 94 L.Ed.2d 179 (1987), the appellant was charged with eight counts of murder during robbery, § 13A-5-40(a)(2), Code of Alabama 1975, four of which related to the taking of a taxi and four of which related to the taking of currency. In that case, this Court stated that, because the purpose and effect of the joinder of offenses was to meet every possible contingency that the evidence might show, rather than to convict the appellant of multiple offenses, the State was not required to elect the count on which the case would be submitted to the jury. In the present case, the appellant was indicted on two, rather than eight, counts of capital murder, and the trial court likewise did not require him to elect the count on which he was to be tried. However, the appellant was convicted of only one offense, and the indictment was proper.
In Meyer v. State, 575 So.2d 1212 (Ala.Cr.App. 1990), the appellant was indicted on three counts of capital murder for one killing. He was found guilty of three counts of intentional murder, and the trial court imposed a single sentence of 50 years' imprisonment. This Court, citing Ball v. United States,470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985), remanded the case for the circuit court to vacate two of the convictions. In Ball, the United States Supreme Court explained that a second conviction is an impermissible punishment, even if it results in no greater sentence,[2] because it may have potential adverse collateral consequences such as delayed parole eligibility or an increased punishment for recidivism. In the present case, however, unlike Ball, there was no second conviction. The double jeopardy concerns, therefore, are inapplicable.
In Tucker v. State, 537 So.2d 59, 61 (Ala.Cr.App. 1988), the appellant was charged in a single indictment with the murder of a peace officer while the officer was on duty or in the act of arresting or attempting to arrest the appellant or his stepmother. The appellant moved to dismiss the indictment, on the grounds that it charged two crimes and that it was so ambiguous that he could not determine what acts constituted the crime. This Court found that the indictment was properly *Page 96 
framed to conform to the proof, in that it charged only one offense — capital murder of a peace officer — which was committed for one of two reasons: either because the officer was trying to arrest the appellant's stepmother or the appellant himself.
In the present case, although the instructions of the trial court were confusing, the Court sufficiently informed the jury with regard to the burden of proof and the necessity for unanimity in its verdict. The juror s were aware that the appellant was guilty of only one offense, as evidenced by their verdict form, which stated the single offense of "the capital felony as charged in the indictment." Their death penalty decision therefore was not improperly affected by the framing of the indictment.
 II.
The appellant contends that the trial court erred in failing to find statutory and nonstatutory mitigating circumstances. He argues with regard to the statutory circumstances that the trial court had before it evidence that the capital offense was committed while he was "under the influence of extreme mental or emotional disturbance" and that his "capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired," § 13A-5-51
(2) and (6), Code of Alabama 1975. Specifically, he refers to defense expert Dr. Barry Amyx's testimony that he suffered from a delusional disorder, a psychotic illness similar to schizophrenia, and that he also suffered from persecutory delusions and a "thought disorder." Dr. Amyx expressed the opinion that the appellant could not fully appreciate the criminality of his conduct. In addition, the appellant argues that State's witness Ollie Doss testified that he looked "crazy" when she saw him on the night of the offense. He also contends that the trial court misunderstood the burden of proof with regard to mitigating circumstances and incorrectly believed that the appellant had to show that he was insane.
The trial court found with regard to § 13A-5-51 (2), Codeof Alabama 1975, that the capital offense was committed while the appellant was under the influence of a mental or emotional disturbance but that the disturbance was not extreme. The court also found that the appellant had a personality disorder but that he was not psychotic. Defense expert Dr. Claude Brown had testified that, in his opinion, the appellant suffered from a personality disorder, rather than a psychosis, and that there was no evidence that the appellant was delusional at the time of the murder. It is apparent from the trial court's sentencing order that the court was aware of the appropriate burden of proof with regard to insanity. The court noted that Dr. Amyx had conducted a single 90-minute session with the appellant five years after the homicide, while Dr. Claude Brown had met with the appellant at least three times, two of those occasions occurring within five months of the murder. In addition, the court found that the purposefulness of the appellant's behavior undermined his claim of extreme disturbance and that his ability to clearly express his feelings and his opposition to previous use of an unwarranted insanity defense refuted his claim. The trial court's finding that, from a preponderance of the evidence, the § 13A-5-51
(2) mitigating circumstance did not exist, is supported by the record. Because the appellant did not object to the trial court's sentencing order, this issue is affirmed under the plain error standard. Rule 45A, Ala.R.App.P.
With regard to the § 13A-5-51(6) mitigating circumstance, the trial court found that the preponderance of the evidence suggested that the appellant could appreciate the criminality of his conduct and conform his conduct to the requirements of law. The court also again stated that the appellant had a personality disorder but that he was not psychotic. The record supports the court's finding.
With regard to nonstatutory mitigating circumstances, the appellant argues that there was ample evidence offered at the penalty phase to support the existence of such circumstances. Specifically, he refers to Dr. Amyx's testimony as to the appellant's mental illness, his mother's plea for mercy, a friend's testimony concerning a positive change in the appellant since the killing, and *Page 97 
the appellant's own statement, in which he expressed remorse and apologized to the victim's family. In addition, the appellant argues that the trial court's sentencing order was insufficient because it did not specifically identify the mitigating circumstances found and weighed by the court.
However, the order of the trial court stated, in pertinent part, that the court "considered the testimony of lay witnesses and all other mitigating evidence offered by the Defendant, including that not enumerated as statutory mitigating circumstances." The court was not required to state that it considered a particular mitigating circumstance, and the lack of a specific finding did not mean that the court did not consider that evidence. Ex parte Haney, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). With regard to the appellant's statement, although the appellant said that he was sorry that the victim's family had suffered, he also said that "there was no perceived action on my part for this to occur," and he again claimed that the killing was committed, in self-defense. Further, although the appellant said that he was asking for forgiveness, he also said that, because he knew that God had already forgiven him, he was "at peace" with himself. Similarly, the testimony of the appellant's friend was actually that the appellant would now talk about the Lord, that he appeared concerned about people, and that he was not as quick to get angry. The trial court's finding that no nonstatutory mitigating circumstances existed is supported by the record.
 III.
The appellant contends that the jury was improperly charged that his conduct created a great risk of death to many persons. The trial court instructed the jury that it could consider the aggravating circumstance under § 13A-5-49(3), Code of Alabama 1975, but subsequently found in its sentencing order that this circumstance did not exist. The appellant argues that, although the court's final determination was correct because the appellant was not attempting to hurt anyone other than the two intended victims, the placing of the circumstance before the jury could have convinced some jurors who otherwise would have voted for life without parole to vote for death. As there was no objection to the trial court's oral charge, this issue is subject to review under the plain error standard, Rule 45A, A.R.App.P.
The § 13A-5-49(3) aggravating circumstance was properly presented to the jury. There was undisputed evidence that, after the appellant shot Officer Schulte, he fired several shots at Cheryl Green as she attempted to run from him. Green's daughter Kimberly Hughes was standing beside her when the appellant fired, and Green attempted to shield the child from the shots. Also present, standing outside a truck that was parked immediately adjacent to Officer Schulte's car, was Buffy Trapp. John Chadwick was seated inside the truck and was so near that, when Chadwick fled after the appellant shot Green, the appellant was running behind him. In addition, the shooting took place in a residential neighborhood, and one of the neighbors, Ray Kilpatrick, witnessed the shooting from his porch.
The appellant was aware of the residential character of the neighborhood because he had previously lived there. In addition, he was positioned so that he could actually see Hughes, Chadwick, and Trapp. Therefore, the appellant could have foreseen that his firing at Cheryl Green would create a great risk of death to many persons other than the two intended victims. The appellant contends that the State argued at the close of the guilt phase that "the only risk of death during this offense" was to the two intended victims. However, the prosecutor's actual argument was that the appellant did not shoot Hughes, Chadwick, or Trapp but instead shot "the two people he was mad at." The prosecutor did not contend that the others were not at risk. Based on the record, there is no error or plain error in the trial court's presenting the § 13A-5-49(3) Code of Alabama 1975, aggravating circumstance to the jury.
 IV.
The appellant contends that the trial court erred in allowing nonstatutory aggravating *Page 98 
circumstances to be submitted to the jury and also that it improperly considered nonstatutory aggravating circumstances. First, he argues that the court unlawfully used a mitigating circumstance (prior criminal history) as an aggravating factor. He also argues that the court's use of the phrase, "20-year history of at least nine criminal convictions," indicated that the court improperly considered juvenile convictions. Because the appellant did not object to the trial court's sentencing order, these issues are affirmed under the plain error standard. The appellant quotes the following portion of the trial court's sentencing order in support of his argument:
 "(1) The Defendant indeed has a significant history of prior criminal activity. The pre-sentence report documents a 20-year history of at least nine criminal convictions, most of which involve the threat or use of violence against other human beings. Therefore, the Title 13A-5-51 (1) factor does exist and is considered."
(Emphasis added.)
However, the part of the sentencing order quoted by the appellant is the first in the section of the sentencing order entitled, "II. MITIGATING CIRCUMSTANCES," and it is clear from the context that this finding was inadvertently recorded as an affirmative finding. The findings of the trial court with regard to mitigating circumstances follow the statutory order of §13A-5-51, Code of Alabama 1975, wherein "No significant history of prior criminal activity" is the first circumstance listed. In addition, the appellant admits that, in Freeman v. State,555 So.2d 196 (Ala.Cr.App. 1988), aff'd, 555 So.2d 215 (Ala. 1989),cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284
(1990), this Court found that a similar error with respect to juvenile adjudications was harmless because the appellant also had adult criminal convictions.
The appellant also contends that the trial court improperly found nonstatutory aggravating circumstances as evidenced by the following in its sentencing order:
 "The murder of Julius Schulte was a consciousless [sic] act committed by a man whose life history is but one sequel after another of violent, assaultive acts against other human beings and with total disregard for our laws and those who are charged with enforcing them."
However, the passage in question is not included in the section of sentencing order entitled, "I. AGGRAVATING CIRCUMSTANCES." This passage appears instead in the portion of the order in which the court explains its weighing of the aggravating and mitigating circumstances. It is apparent that the passage was not referring to an improper nonstatutory aggravating circumstance.
The appellant also argues that the State and the trial court added another nonstatutory aggravating circumstance when the court allowed the prosecutor to state to the jury in his penalty phase argument, "You've seen the first three and [this] verdict makes the fourth conviction of crimes of violence committed by this Defendant." The appellant cites in support of his argument cases that hold that convictions, not charges, are to be considered; these cases are inapplicable because the crime at issue here was a conviction. Moreover, the mere fact that certain facts were mentioned at some point in the court's sentencing order did not mean that the court improperly considered them as aggravating circumstances. Based on the record, there is no plain error.
The appellant contends that the prosecutor presented victim impact arguments, which, he says, were improper because they distracted the jury from determining culpability. Specifically, he argues that during the guilt-phase closing argument, the prosecutor erred in stating the following with regard to one of the eyewitnesses to the crime:
 "I don't know if any of us can imagine what young Kim Hughes has been through in her lifetime. She was ten years old at the time she saw her mother gunned down and saw a police officer killed before her very eyes."
However, the victim in this case was Julius Schulte, not Kim Hughes, and the statements *Page 99 
made by the prosecutor were not improper argument because they represented his inferences and conclusions drawn from evidence which had been presented at trial. In Sanders v. State,423 So.2d 348 (Ala.Cr.App. 1982), this Court stated that the rules governing a counsel's inferences from the evidence are to be liberally construed, and that control of closing argument rests in the broad discretion of the trial court. The prosecutor's statements concerning Kim Hughes, therefore, were not error.
The appellant also contends that the prosecutor erred in arguing the worth of the victim, as follows:
 "I want you to look at the man who was Julius Schulte. This is the man who spent 13 years of his long career working with kids as a juvenile probation officer, and as a parent and as any parent can tell you, that takes a lot of patience. He wasn't just a juvenile officer. That night he could have just said, once he found out that Kim was okay, he could have said, `I'm out of here.' But that wasn't Julius Schulte. Julius waited, called his backup, to see if he could help further. This is the kind of man that was executed by this Defendant on that occasion, and, folks, that is why I stand before you today and respectfully ask you to return verdicts of guilty on both counts."
The prosecutor's statements concerning Julius Schulte also represented inferences and conclusions drawn from the evidence that was presented at trial. The trial court did not abuse its discretion by permitting the prosecutor's statements during his guilt-phase argument. There is no error with regard to this issue.
 VI.
The appellant contends that the trial court erred in refusing his requested jury instruction on manslaughter because, he says, he testified to facts that provided a rational basis for the lesser charge. He argues that the jury could have found that the killing arose from a sudden heat of passion caused by provocation because he stated that he argued with the victim, that he wanted to leave, and that the victim would not let him. He also argues that "he perceived . . . an attack upon him" because the victim was opening the car door and he believed that the victim had a gun in his hand and was going to shoot him.
However, mere words or gestures will not reduce a homicide from murder to manslaughter, Harrison v. State, 580 So.2d 73
(Ala.Cr.App. 1991), and undisputed evidence established that the appellant failed to show legal provocation. The victim's car was found with the door closed, and his gun was found in a snapped holster, sitting on top of his clipboard on the car seat. He had been shot twice, once in the back of the head and also in the left temple, and gunpowder residue was deposited around this wound. Thus, there was no rational basis to support the appellant's requested instruction on the lesser included offense, and it was properly refused by the trial court. Dill v. State,600 So.2d 343 (Ala.Cr.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293,122 L.Ed.2d 684 (1993).
 VII.
The appellant contends that the trial court erred in denying his motion for a change of venue. He argues that there was media cover age of the crime throughout Mobile County, by newspapers, radio, and television, and that, although the crime occurred nine years before this third trial, eight members of the venire indicated that they had prior knowledge of the case.
Venue should be changed when there is a showing of inherently prejudicial publicity that has so saturated the community as to have a probable impact upon the jurors. Jackson v. State,516 So.2d 726 (Ala.Cr.App. 1985). Here, the appellant has presented no evidence with regard to prior publicity. With regard to probable impact, the record reveals that 8 of 60 veniremembers responded that they had some prior knowledge concerning the appellant's case. The trial court conducted an individual voir dire of those eight and permitted the appellant to challenge for cause all of them to whom he objected. One was struck because he had "already given us a number of reasons," *Page 100 
another stated that he "believe[d] that if the Defendant was indicted and he's here, probably had one or two court trials already, that he's probably guilty, sir," and the third had been acquainted with the victim through her job as a substitute teacher. The remaining veniremembers stated that their knowledge of the appellant's case was general in nature and that they could render a fair and impartial verdict. Therefore, the trial court properly denied the appellant's motion for a change of venue.
 VIII.
The appellant contends that the trial court erred in excusing potential jurors allegedly without adequate cause. Specifically, he argues that the information elicited by the court was insufficient to show undue hardship, extreme inconvenience, or public necessity, as required by § 12-16-63, Code of Alabama
1975, because the court failed to ask two of those potential jurors to elaborate on what other arrangements, if any, were available for the care of their dependent relatives.
The record reveals that during voir dire, the trial court asked the veniremembers if there was a serious reason that any of them could not serve on the jury because they were to be sequestered. Two responded affirmatively. One stated that his mother had just had surgery and that she also had Alzheimer's disease and was being taken care of by a neighbor during the day, the other informed the court that his mother was terminally ill. The trial court then excused both of them, and the appellant did not object. The extreme nature of these illnesses was sufficient to show undue hardship, and the trial court did not abuse its discretion by excusing the two veniremembers from jury service.
With regard to a third veniremember, the record reveals that she was not removed from the venire until after individual voir dire had been completed. At that time, the trial court conducted an off-the-record discussion with an unidentified juror and then a bench discussion with counsel, in which the court stated, "We're going to strike [Mrs. M.] She would be excellent for the State, but she's the bookkeeper and she's got three children and nobody to get them to school. So, I'm going to strike her." The appellant made no objection and the court told Mrs. M. to go "take care of those three children." The court then instructed someone to tell him "what's the actual count now." Upon learning that it was 50, the court stated, "That's an even number," and the parties then immediately proceeded to strike the jury.
It appears from the record that Mrs. M. was struck to bring the venire panel to an even number, rather than excused based on undue hardship. Moreover, the trial court noted circumstances with regard to Mrs. M. that would have constituted business and personal hardship. Therefore, the trial court's decision to strike Mrs. M. did not constitute error or plain error.
 IX.
The appellant contends that the trial court erred in denying him full voir dire of potential jurors with regard to the circumstances under which they would impose the death penalty. Specifically, he argues, he should have been allowed to inquire if jurors who had stated that they could not impose the death sentence could do so in wartime.
The record reveals that, after veniremember R.B. stated that he did not support the death penalty, the trial court permitted the appellant to ask him whether, in "a situation like wartime, like we're in the war with Hitler, Saddam Hussein or something like that," he would oppose "going to war or our country going to wa[r] and taking other people's lives in the protection of our country." The court next questioned veniremember P. H., asking whether "if you were selected as a juror in this case — and I'm not interested in war time . . . there is no set of facts that you . . . could vote for death by electrocution?" After P.H. answered, "Yes, sir," the trial court told him that it would now let defense counsel "ask anything he wishes, to and including war time." However, when counsel attempted to ask P. H., "[C]ould you believe in State imposed killing if it was a war time and like Richard said, he could. Do you feel like in war time you might be able to *Page 101 
do something like that, the court stated, not interested in war time. . . . So, ask about it."
The appellant did not object to the trial court's instruction or further attempt to question the juror concerning his beliefs about killing during a time of war. He now argues that his desired inquiry was whether the juror could impose a death penalty during wartime. However, it is clear from the record that his question at trial actually was whether the juror could support killing in defense of his country during wartime. This question was not sufficiently related to the issue of capital punishment to be relevant, and an affirmative response would not have rehabilitated the juror with regard to the imposition of the death penalty. Therefore, the trial court's refusal to permit the question was not an abuse of discretion.
The appellant contends that the trial court erred in finding that he failed to establish a prima facie case under Batson v.Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The record reveals the following with regard to the appellant'sBatson challenge: The appellant objected at trial to the State's striking 6 of 13 blacks from the venire,[3] the trial court instructed the prosecutor to give race-neutral explanations for his strikes. The prosecutor responded that the appellant first was required to make out a prima facie case and argued that, because the appellant had shown only that blacks had been struck, his challenge must fail because the jury contained a greater percentage of blacks than was originally on the venire. The appellant responded citing Ex parte Bird, 594 So.2d 676 (Ala. 1991), for the principle that evidence that jurors share only the characteristic of race and are heterogeneous as the community as a whole in all other respects, including gender, age, occupation, and social and economic conditions, can raise an inference of discrimination, and noted, "that's what we have here." He then noted specifically that two females and four males had been struck; that Mr. D., who was a laborer at SeaPac had said nothing during the jury selection process; and that Mr. M. worked at Ingalls and had a wife in law enforcement. Thereafter, the appellant stated that the struck jurors were both female and male, younger and older, who worked as laborers, a housing board director, a food server, and an industrial worker. In addition, he stated that the prosecutor had asked few questions on voir dire examination, which would give a reason to believe that there was any basis other than race for the strikes. The trial court responded that the housing board employee had given many answers and that the State could articulate reasons for striking Mr. B., who was the industrial worker. The court also noted that the percentage of blacks serving on the jury was far greater that the percentage of blacks in the county and then asked whether the appellant could show any bias on the part of the State. After the appellant failed to offer evidence of bias, the prosecutor reiterated that the appellant had not made a prima facie showing of racial discrimination. The trial court then denied the appellant's Batson motion.
In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986), the United States Supreme Court set out the components of a prima facie case of racial discrimination in jury selection. In addition to showing that the State used peremptory challenges to remove members of a cognizable group to which he belongs and relying upon the fact that peremptory strikes permit discrimination, a claimant also must show that these facts and any other relevant facts raise an inference that the prosecutor used his strikes in a discriminatory manner. In Ex parte Branch,526 So.2d 609, 622-623 (Ala. 1987), the Alabama Supreme Court explained that relevant factors could include, but were not limited to, the following: evidence that the jurors shared only the characteristic of their group membership and were heterogeneous in all other respects; a pattern of strikes against black jurors; past conduct of the prosecutor; type and manner of the prosecutor's questions during voir dire, including desultory voir dire; type and *Page 102 
manner of questions to the challenged juror, including a lack of questions or meaningful questions; disparate treatment of veniremembers with the same characteristics or type of responses; disparate examination of members of the venire; circumstantial evidence of intent due to the use of most challenges to strike blacks; and the use of peremptory challenges to dismiss all or most black jurors.
The appellant argues on appeal that the State struck 7 of 13 qualified black potential jurors, or over half of the black venirepersons, and that it used 7 of its 18 strikes to remove those black potential jurors. He further argues that 3[4] of the blacks removed by the State did not answer any questions on voir dire and that the prosecutor's office has a history of excluding qualified black potential jurors based on race.
However, the only evidence actually offered by the appellant at trial was as follows: that the State struck 4 black males and 2 black females, who were variously employed; that the State struck 7 of 15 blacks, and that 3 veniremembers who were struck had not responded to any questions on voir dire. Despite repeated requests by the trial court that he produce more evidence, including, specifically, evidence of bias, the appellant offered nothing further in support of his Batson claim.
The appellant's evidence was insufficient to show that the struck jurors shared only the characteristic of race. It also was insufficient to show a pattern of strikes against black jurors, particularly in light of the increased percentage of blacks who served on the jury relative to both the initial panel and the population of the county.[5] The only evidence that arguably could lead to an inference of discrimination was a lack of questions or meaningful questions to 3 of the challenged jurors. The trial court's determination as to whether the defendant has established purposeful racial discrimination should be reversed only if it is clearly erroneous. Ex parte Branch, supra. The trial court's denial of the appellant's Batson motion in the present case was not clearly erroneous.
The appellant contends that the trial court erred in instructing the jury that it had a duty to reconcile the testimony of the witnesses. He argues that this instruction invaded the province of the jury and could have conditioned the jurors to disbelieve uncontroverted testimony.
However, the record reveals that the trial court's actual charge was, in pertinent part, as follows:
 "Now, . . . you might logically assume that all witnesses who take the oath are presumed to speak the truth. Our Supreme Court has said, and I believe correctly so, that no such presumption exists. You, as the sole triers of the facts, are to determine that. I will tell you it's the law of this State that if you can reconcile the testimony of all the witnesses with that of being the truth, then, of course, you should do so. If you cannot do that, then, again, as the sole triers of the facts in this case you must determine which witness or witnesses you choose to believe and which witness or witnesses you choose not to believe.
 "I will tell you it's the law of this State that if you believe any witness has wilfully sworn falsely to a material fact, you may, if you wish, disregard that person's entire testimony. The theory of our law being simply this: If a person would testify falsely in any material aspect — not any inadvertent answer, but would wilfully testify falsely in any material aspect, the law would presume that person would testify falsely in any other material aspect.
 "Of course, you may consider many other things: the demeanor of the witness on *Page 103 
the stand, and that simply means how that person answered the questions asked them; his or her ability to see and know the facts about which he or she has testified; how that person may be affected by your verdict; or, another way of saying the same thing, is any bias or prejudice which any witnesses may possibly possess . . ."
The record further reveals that the appellant did not object at trial to this portion of the court's oral charge; therefore, this issue must be reviewed under the plain error standard. Rule 45A, A.R.App.P. In Williams v. State, 601 So.2d 1062 (Ala.Cr.App. 1991), aff'd, 662 So.2d 929 (Ala. 1992) (table), cert. denied,506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992), this Court considered a jury instruction and charge nearly identical to those given by the court in the present case. We determined in that case that there was no plain error because, although the single instruction with regard to reconciliation, viewed in the abstract, could have been confusing, that instruction should not be judged in isolation but had to be considered in the context of the overall charge. Here, similarly, viewed in the context of the overall charge, the court's instruction with regard to reconciling the testimony of the witnesses was not plain error.
 XI.
The appellant contends that the trial court erred in admitting into evidence a police lapel badge that was, he says, false and artificial evidence. He argues that, in Carson v. Polley,689 F.2d 562 (5th Cir. 1982), the admission of a replica knife was condemned as prejudicial because it was the subject of a factual dispute as to whether it was actually possessed by a man who had been subjected to police force. The appellant argues that the present case is similar, in that the central issue was a factual dispute as to whether he knew Julius Schulte was a police officer because Schulte was wearing a police badge.
However, the appellate court's objection to the evidence introduced in Carson was that it was not made clear to the jury that the replica knife had no connection with the knife allegedly in Carson's possession when he was arrested. The appellate court noted that trial courts have great discretion in this area and conceded that the replica knife could ordinarily have been admitted as illustrative or demonstrative evidence. However, the court stated that the admission of the knife was error under the facts of Carson because a deputy policy chief was allowed to testify to the chain of custody and refer to the replica as "the" knife when he was unable to positively identify the weapon. No such error exists in the appellant's case.
In Liberty National Life Ins. Co. v. Weldon, 267 Ala. 171,100 So.2d 696 (1957), the Alabama Supreme Court stated that articles or objects that relate to or explain the issues are admissible in evidence when duly identified and shown to be in substantially the same condition as at the time of the occurrence. Here, Officer John Wynne clearly testified that the police badge introduced into evidence was "not Cpl. Schulte's badge," although he stated that it was similar to the one that Schulte would have been wearing at the time of the killing. Based on Wynne's testimony, the trial court did not err in admitting the lapel badge into evidence.
 XII.
The appellant contends that the trial court erred in overriding the jury's verdict of life imprisonment without parole pursuant to § 13A-5-46, Code of Alabama 1975. He argues that §13A-5-47, Code of Alabama 1975, permits a standardless override which, he says, violates the Sixth and Fourteenth Amendments to the United States Constitution because it fails to consider the jury's role in the sentencing process and permits arbitrary and uneven imposition of the death penalty.[6]
However, in Spaziano v. Florida, 468 U.S. 447, 459,104 S.Ct. 3154, 3161, 82 L.Ed.2d 340 (1984), the United States Supreme Court determined that capital sentencing is not a trial for purposes of the Sixth Amendment's guarantee of a jury trial. In addition, the Court stated that a capital sentence need not be *Page 104 
imposed by a jury in order to satisfy the Fourteenth Amendment requirement that the death penalty not be imposed arbitrarily or discriminatorily. The Alabama override provision requires the trial court to "consider the recommendation of the jury contained in its advisory verdict," § 13A-5-47(e), Code of Alabama
1975, unless the verdict has been waived. In addition, §13A-5-53, Code of Alabama 1975, mandates a detailed and exacting review of the trial court's findings and decision, and subsection (b)(3) specifically requires the appellate court to review whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases.
The record reveals that the appellant did not object to the trial court's override of the jury's advisory verdict. Therefore, reviewed under the plain error standard, the trial court's override is affirmed.
 XIII.
In accordance with the requirements of § 13A-5-53, Code ofAlabama 1975, we have reviewed the record, including the guilt and sentencing proceedings, for any error that adversely affected the substantial rights of the appellant, see Rule 45A, A.R.A.P., and have found none. In addition, we have found no evidence that the appellant's sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.
The trial court properly found the existence of two aggravating circumstances: First, that the capital offense was committed by a person under sentence of imprisonment, § 13A-5-49 (1), Codeof Alabama 1975, and, second, that the appellant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person, § 13A-5-49 (2), Codeof Alabama 1975. In addition, the court properly found no mitigating circumstances.
After an independent weighing of the circumstances, this Court finds that the trial court's sentence of death was proper. This Court further finds that, considering both the crime and the defendant, the sentence is not excessive or disproportionate to the penalty imposed in similar cases. Therefore, the appellant's conviction and sentence of death are proper. The judgment of the trial court is affirmed.
AFFIRMED.
All judges concur except COBB, J., who recuses.
[1] Cheryl Green's last name also appears as "Greene" elsewhere in the record.
[2] Ball's sentences were to be served concurrently.
[3] Two black veniremember were struck for cause, one by the State and one by the appellant, and the appellant also struck an alternate juror who was black, which left six blacks on the jury panel.
[4] The appellant incorrectly states in his reply brief that the number of unquestioned jurors was four.
[5] The prosecutor informed the trial court that the 60-member panel was 75% white and that the percentage of blacks on the final panel was "almost double" that on the initial panel. The trial court also noted that the trial jury panel was 50% black "far more" than the 30% population of blacks in the county.
[6] The appellant concedes that the sentencing scheme is constitutional on Eighth Amendment grounds, pursuant to Harris v.Alabama, 513 U.S. 504, 115 S.Ct. 1031, L.Ed.2d 1004 (1995).