The appellant, Edward Curry Johnson, was charged by a two-count indictment, under count one, with the murder of Antonio DeWayne Hendricks, made capital because it was committed during a robbery, see § 13A-5-40(a)(2), Code of Alabama 1975, and, under count two, with the murder of Antonio DeWayne Hendricks, James Garrett, and Alejandra Clinton, made capital because two or more persons were murdered as a result of one act or pursuant to one scheme, in violation of §13A-5-40(a)(10), Code of Alabama 1975. On April 16, 1992, the jury returned its verdicts, finding Johnson guilty of the lesser included offense of murder on count one of the indictment and not guilty on count two of the indictment. The trial court entered a judgment on the verdict, and on May 22, 1992, conducted a sentencing hearing, at the conclusion of which Johnson was sentenced to life in prison. On May 29, 1992 the defense moved for a new trial and gave notice of appeal. The motion for new trial was denied on August 28, 1992.
The State's evidence indicates that on July 2, 1991, Antonio DeWayne Hendricks, James Garrett, and Alejandra Clinton were shot to death near an apartment complex located on 2nd Court North in Birmingham, Alabama. The trial testimony indicated that in the early evening hours of July 2, 1991, several persons, including the appellant, met in an apartment and discussed luring Antonio Hendricks to the apartment. The plan was that they would then tape his hands, take from him drugs, a gun and money that they expected him to have on his person, take him to a cemetery, and kill him. Some testimony indicated that only two of the individuals present were without a weapon and that some of the weapons were brought to the apartment by the appellant. Testimony further indicated that the appellant initiated the conversations concerning the killing and that the appellant instructed some of the persons as to where they should be located when Hendricks arrived at the apartment.
Hendricks came to the apartment with James Garrett and Alejandra Clinton. Shortly after Hendricks entered the apartment, shooting began. Clinton was shot in the back. Garrett, because he was not yet in the apartment ran when the shooting began and was shot outside the apartment complex, and Hendricks ran out of the apartment toward Third Avenue North, carrying a cellular telephone. There was testimony that a tall individual ran after Hendricks and shot at him. A witness who lives near the apartment complex and Third Avenue North testified that he observed a short, "chubby" man carrying a cellular telephone, run from the direction of 2nd Court North, cross Third Avenue and stop in front of his house. The witness said that another man, who seemed to be unloading a gun as he crossed Third Avenue, was following the first man. The first man walked toward a tire store. The witness went into his house when he saw the second man unloading what appeared to be a gun.
The owner of the tire store testified that he had just locked the door to the store and was about to get in his vehicle when he saw a short heavy-set man carrying a cellular telephone approach the store. This witness stated that he then saw a man loading a gun coming down the street. The witness turned and ran, but stopped behind a bus at the edge of the parking lot to the store when he realized the man with the gun was not pursuing him. The witness testified that he saw the two men running around a vehicle in the parking lot and could hear the man with the telephone call the other man by name. As the man with the telephone tried to run from *Page 446 
the vehicle, the other man shot at him, and the man with the telephone stopped. The man with the gun approached the first man and shot him in the head. The witness said that he then saw a red Cadillac automobile drive up and that the gunman got in the Cadillac and left the scene.
Another witness for the State testified that he was visiting a friend at the apartment complex on the day of the shooting. The witness stated that he owned a brown Cadillac automobile which was parked in front of the apartment complex when he heard gunshots. After the gunshots had stopped, the witness decided to move his vehicle. As he was moving his vehicle, two individuals with guns came from the rear of the apartment complex, got into the witness's Cadillac, and told him to drive the car. The two men made the witness pick up a third man near the tire store. The witness identified this third man as the appellant. The witness testified that as the appellant got into the vehicle, the appellant stated, "I shot him in the head." As the witness and the three men drove past the tire store, the witness saw a man, later identified as Hendricks, lying on the ground near the tire store. The witness was then told by the men in his vehicle where to take them.
According to the testimony of the police who investigated the scene, a .32 caliber pistol was found near Clinton's body, which was near the apartment complex. Several bullets and shell casings were also found in the apartment and nearby area. The police found a .38 caliber bullet and a roll of tape in the Cadillac. The .38 caliber bullet found in the Cadillac was the same brand as the cartridges found in the street near the tire store.
Autopsies and forensic science tests performed reveal that Clinton died as a result of multiple gunshot wounds inflicted by the .32 caliber gun found near his body; Garrett died of loss of blood secondary to a gunshot wound that was inflicted by a .380 or .357 handgun; and Hendricks died as a result of multiple gunshot wounds to the head, which were inflicted by a .38 caliber gun.
At trial, the appellant testified that he had not carried any weapons with him to the apartment complex and that he did not participate in discussions about killing Hendricks or any one else. In his testimony, the appellant stated that he did not instruct persons at the apartment as to where they should place themselves for the shooting. The appellant testified that Antonio Hendricks and two other individuals came to the apartment and began shooting. The appellant said that he ran out of the apartment, at which time he heard more shooting. The appellant testified that he and another individual then obtained a ride home.
 I
The appellant first argues that the trial court erred in denying the defense's Batson motion, which alleged that the State had exercised its peremptory challenges in a discriminatory manner by attempting to exclude blacks from the petit jury. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1985).
The record reflects an extensive voir dire examination of the potential jurors in this case because the defendant was charged with two counts of capital murder. There were 42 veniremembers. Of those, 19 were black. The State struck four blacks from the venire: three black females and one black male, each of whom had expressed concerns about the death penalty. The defense struck a total of six black veniremembers: four black females and two black males, thus leaving eight black individuals serving on the petit jury. In addition, the alternate juror was black.
The trial court must require the State to come forward with explanations for its peremptory challenges against black members of the venire if the defense makes a prima facie showing that the State used its peremptory challenges in such a manner as to raise an inference of discrimination. Ex parteBranch, 526 So.2d 609, 623 (Ala. 1987).
The trial court found that the defense counsel failed to make a prima facie case of purposeful discrimination by the State and, therefore, it did not require the State to give explanations for the use of its peremptory challenges. This Court, on review, gives the trial court great deference in determining *Page 447 
whether a defendant has made a prima facie showing of discrimination. We may reverse the trial court's determination that no prima facie case was made only if that determination was clearly erroneous. Ex parte Branch, at 625.
The Alabama Supreme Court, in Ex parte Branch, supra, has set forth several examples of relevant circumstances that establish a prima facie case. Id. at 622-23. In this case, we fail to see from the record where defense counsel provided any relevant circumstances to establish an inference that the State used its peremptory challenges in a discriminatory manner. Therefore, we cannot hold that the trial court's decision that there was notBatson violation was clearly erroneous.
 II
The appellant next challenges the trial court's denial of a judgment of acquittal with regard to the charge, of murder during a robbery in count one indictment. Specifically, the appellant argues that the State failed to establish the element of theft or attempted theft of money or property of Hendricks. We find the appellant's argument is without merit.
Count one of the indictment essentially charged the appellant with intentionally causing the death of Hendricks by shooting him while the appellant was committing a theft of Hendricks's money by the use of force, with the intent to overcome his physical resistance or physical power of resistance, while the appellant was armed with a deadly weapon. We conclude that sufficient evidence existed to present this charge to the jury.
When presented with the issue of whether there was sufficient evidence to present the case to a jury, this Court must accept as true the evidence introduced by the prosecution, make all legitimate inferences from that evidence, and consider that evidence in the light most favorable to the prosecution.Morgan v. State, 589 So.2d 1315 (Ala.Crim.App. 1991); Bentonv. State, 536 So.2d 162, 165 (Ala.Crim.App. 1988); Jackson v.State, 516 So.2d 726, 752-53 (Ala.Crim.App. 1985).
The jury, in this case, could have found from the evidence presented by the State that the appellant had participated in a conspiracy or had acted as an accomplice with the other individuals present at the apartment and that the appellant's intent was to take Hendricks's drugs, money, and a gun that he had on his person. This evidence, when viewed in the light most favorable to the prosecution, adequately presented a question for the jury as to whether the appellant was guilty of murder during the course of a robbery.
 III
The appellant next argues that the trial court erred in determining that a witness for the State was unavailable for trial and, therefore, that the witness's previously transcribed testimony from the preliminary hearing was admissible. We agree with the trial court's ruling.
Outside of the presence of the jury, the trial court conducted a rather extensive hearing to determine whether the State's witness was actually unavailable and whether the State had exercised due diligence in its efforts to locate the witness. The hearing included the testimony of the witness's mother, the witness's girlfriend, an investigator for the State, and a jailer for the city. The witness had a murder charge, unconnected to the case at bar, pending against him and had recently escaped from jail. Each person who testified to the witness's unavailability indicated that each had made efforts to locate the witness, but that he could not be found.
A party seeking to introduce a witness's testimony from a prior proceeding at a subsequent proceeding, must establish the unavailability of the witness and the reasons therefor.Lamar v. State, 578 So.2d 1382 (Ala.Crim.App. 1991), cert. denied, Ex parte Lamar, 596 So.2d 659 (Ala. 1991). This predicate is fulfilled when the party offering the evidence establishes that it has exercised due diligence in obtaining the witness, but without success. See Matkins v. State,521 So.2d 1040, 1041-42 (Ala.Crim.App. 1987).
The sufficiency of proof for establishing the predicate of unavailability is left to *Page 448 
the sound discretion of the trial court. Nolen v. State,469 So.2d 1326, 1328 (Ala.Crim.App. 1985). Here, the trial court ruled that the State had exercised due diligence in trying to procure the witness. The trial court made this determination after a thorough examination of the matter. We cannot hold the trial court abused its discretion.
 IV
Last, the appellant argues that the trial court erred in refusing to allow the defense to present testimony of certain witnesses because the witnesses were in the courtroom during the State's case-in-chief. The appellant argues that the sequestration rule for witnesses had not been invoked. However, a review of the record clearly reveals that the rule had been invoked and that counsel for the defense and State were aware that the rule had been invoked. The following transpired out of the presence of the jury:
 "THE COURT: . . . [A]nd the rule had been invoked, of course, early in the case. I think I remember asking the lawyers to check the courtroom, etc., did I not?
 "MS. ERSKINE [Assistant Defense counsel]: Yes, sir, you did.
 "MR. SANDERSON [Defense counsel]: I believe you did.
". . . .
 "MR. SANDERSON: During the lunch recess I had a discussion with a Ms. W.C., who is a person acquainted with the defendant. And her comments to me were such that she knew the defendant and was aware of his reputation in the community for honesty and truthfulness. And she is willing to testify. And as was the case with Mr. L.J., Ms. C. has been in the courtroom at least for today and I had not intended to call her as a witness. But, even so, the rule had been invoked and now she is a prospective witness that I would intend to call.
 "THE COURT: Well, I am just thinking out loud, if that is a big part of your case I am sure there are other people that could testify to truthful reputation, Mike. Do you object to it, Mr. Davis?
"MR. DAVIS [Prosecutor]: Yes, sir, I object.
 "THE COURT: All right. I will not allow [W.C.] to testify, Mike, since she has been in the courtroom."
It is evident that the rule of sequestration had been invoked. The Alabama Supreme Court has held that the trial court, in its discretion, may disallow the testimony of a witness after the rule has been invoked when the witness remains in court to hear other testimony. Ex parte Faircloth,471 So.2d 493, 496 (Ala. 1985). Moreover, the Court in Ex parteFaircloth reaffirmed the principle that the defendant must be without fault in the proposed witness's violation of the trial court's sequestration order. Id. at 497. In light of the fact that the defense was aware that the rule of sequestration had been invoked and the defense did not attempt to keep its potential witnesses from hearing testimony of other witnesses, we do not find that the trial court erred. The judgment of the trial court is affirmed.
AFFIRMED.
All the Judges concur.