727 So.2d 123 (1997)
Nathaniel SCROGGINS
v.
STATE.
CR-96-0902.
Court of Criminal Appeals of Alabama.
September 26, 1997.
Rehearing Denied October 31, 1997.
*124 Charles Amos Thompson, Birmingham, for appellant.
Bill Pryor, atty. gen., and Beth Slate Poe, asst. atty. gen., for appellee.
BROWN, Judge.
The appellant, Nathaniel Scroggins, was convicted of one count of murder, a violation of § 13A-6-2, Code of Alabama 1975; one count of murder made capital because it was committed by or through the use of a deadly weapon while the victim was in a vehicle, a violation of § 13A-5-40(a)(17), Code of Alabama 1975; and one count of murder made capital because it was committed by or through the use of a deadly weapon fired or otherwise used within or from a vehicle, a violation of § 13A-5-40(a)(18), Code of Alabama 1975. He was sentenced to life imprisonment for the murder conviction, and to a term of life imprisonment without the possibility of parole for the two capital murder convictions.
The evidence presented at trial established the following. On December 6, 1995, the victim, 19-year-old Richard Fields, left his residence and went with some friends to the Anchor Motel, which was located on the east side of Birmingham. At the motel, he met his friend Billy Joe Williams and the appellant. Shortly thereafter, the three young men left the motel in the victim's car and went to someone's house to buy some marijuana. *125 The victim and the appellant agreed to split the cost of the marijuana, and the appellant advanced the victim some money for his share of the marijuana. At the dealer's house, a member of the group purchased two $5 bags of marijuana and they then left.
The victim drove to the end of the street and stopped the car. He and the appellant discussed the money that was used to purchase the drugs. According to Billy Joe Williams, the appellant did not believe that the victim intended to repay him. Williams, who was seated in the front passenger seat, testified that he was looking away and that he did not see what happened between the victim, who was seated in the driver's seat, and the appellant, who was seated in the backseat. Williams testified that he heard two shots fired from the backseat, then he looked up to see the victim "slide over and hit his head on the window." Williams asked the appellant to tell the police that they were at his aunt's house and that they did not know anything about the shooting. Williams then jumped out of the car and ran down the street to his aunt's house.
During the early morning hours of December 7, 1995, law enforcement officials discovered the body of the victim lying face down in the street. No vehicle was nearby, and no weapon was found in the vicinity of the body. The following day, the victim's uncle identified a vehicle that had been abandoned in the Food World grocery store parking lot as the vehicle that his nephew had been driving the previous night.
An autopsy performed on the victim established that the victim died from a gunshot wound to the head. The postmortem examination also revealed a second, nonlethal gunshot wound to the head, and that at the time of his death, the victim had a blood-alcohol content of 0.03%, as well as a nonlethal level of cocaine in his system. The bullet removed from the victim's head had been fired from a.25 caliber gun.
The appellant did not dispute that he shot the victim, but his version of the events of December 6, 1995, differed from Williams's version. He maintained that he acted in self-defense. The appellant testified that he was afraid of the victim because the only time he had seen the victim previously, the victim was "handling guns." The appellant said that he believed the victim was not going to repay the $5 he had advanced him to purchase the marijuana. The appellant further testified that he asked the victim to take him home, but that the victim refused to do so. He claimed that the victim told him to "shut up" or that he would take all of the appellant's money. The appellant initially claimed that the victim then stopped the car and reached back, as if he were going to slap him. Later, the appellant testified that the victim reached under the seat and pulled out a gun. At that point, the appellant pulled out his own gun, a .25 caliber automatic, and fired two shots. The appellant maintained that he wanted to tell the police, but that Billy Joe Williams told him that "he [Williams] was not going to jail for anyone." He testified that Williams dragged the victim out of the car and that Williams also removed a gun from the victim's body. They left the victim's body in the street. The appellant then rode to the Food World grocery store with Williams, and they left the car in the parking lot.

I.
The appellant contends that the trial court erred by admitting into evidence two photographs that depicted the extent of the victim's injuries. Specifically, the appellant complains that the photographs were "grossly inflammatory, irrelevant" and "gory."
The law in Alabama has long been that photographs are admissible into evidence under certain conditions.
"`As a general rule, photographs are admissible into evidence if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge. Photographs which depict the character and location of external wounds on the body of a deceased are admissible even though they are cumulative and based upon undisputed matters. The fact that a photograph *126 is gruesome and ghastly is no reason to exclude its admission into evidence, if it has some relevancy to the proceedings, even if the photographs may tend to inflame the jury.'
"Magwood v. State, 494 So.2d 124, 141 (Ala.Cr.App.1985), affirmed, 494 So.2d 154 (Ala.1986) (citations omitted)."
Harris v. State, 632 So.2d 503, 530 (Ala.Cr. App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). See also Travis v. State, [Ms. CR-92-958 at 84, April 18, 1997] ___ So.2d ___, ___ (Ala.Cr.App.1997); Howard v. State, 678 So.2d 302, 304 (Ala.Cr. App.1996).
In the present case, both photographs (State's exhibits 16 and 17) were relevant because they depicted the extent of the injuries caused by the two gunshots to the victim's head. The photographs also illustrated the forensic pathologist's testimony regarding the victim's autopsy. Moreover, because the remaining photographs (State's exhibits 12-15) were photographs of the victim's body and did not show the wounds, State's exhibits 16 and 17 were not cumulative of any other photographs. See Dabbs v. State, 518 So.2d 825, 829 (Ala.Cr.App.1987) (photographs of a victim's head injuries taken during an autopsy were gruesome, but necessary to demonstrate the extent of the injuries). Accordingly, the admission of the photographs was not reversible error.

II.
The appellant next contends that the trial court erred by allowing the state to offer into evidence the preliminary hearing testimony of prosecution witness Billy Joe Williams, after it was established that the witness was unavailable to testify at trial.
The general rule is that hearsay evidence is inadmissible unless it falls into one of the recognized exceptions to the general exclusionary rule against hearsay. These exceptions are contained in Rule 803 ("Hearsay Exceptions; Availability of Declarant Immaterial") and Rule 804 ("Hearsay Exceptions; Declarant Unavailable"), Ala.R.Evid. One such recognized exception is when the declarant is unavailable; this includes situations in which the declarant "is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance... by process or other reasonable means." Rule 804(a)(5), Ala.R.Evid.
When a declarant is unavailable as a witness, Rule 804(b)(1) provides that the declarant's former testimony from a prior proceeding is admissible, provided the following conditions are met: (1) the former testimony was given under oath; (2) the former testimony occurred "before a tribunal or officer having by law the authority to take testimony and legally requiring an opportunity for cross-examination"; (3) the former testimony was given under circumstances affording the party against whom the witness was offered an opportunity to test the witness's credibility by cross-examination; and (4) the former testimony was given in litigation in which the issues and parties were substantially the same as in the present cause. Despite the appellant's allegations to the contrary, all of these conditions were met in this case.[1]
"A party seeking to introduce a witness's testimony from a prior proceeding at a subsequent proceeding, must establish the unavailability of the witness and the reasons therefor. Lamar v. State, 578 So.2d 1382 (Ala.Cr.App.1991), cert. denied, 596 So.2d 659 (Ala.1991). This predicate is fulfilled when the party offering the evidence establishes that it has exercised due diligence in obtaining the witness, but without success. See Matkins v. State, 521 So.2d 1040, 1041-42 (Ala.Cr.App. 1987)."
Johnson v. State, 623 So.2d 444, 447 (Ala.Cr. App.1993).
In the present case, the state offered the testimony of Morgan Knight, an investigator with the Jefferson County District Attorney's Office. Knight was an experienced investigator, *127 with 7 years' experience with the district attorney's office, and, before that, some 23 years' experience with the Birmingham Police Department. Knight testified that he had been asked to look for Billy Joe Williams before the appellant's case was presented to the grand jury.[2] He was unsuccessful in locating Billy Joe Williams, despite speaking with various relatives and neighbors of Williams, as well as checking out records of utility companies to see if an address could be found for Billy Joe Williams. Knight also looked to see if Williams had a police record; he did. The closest Knight came to locating Williams was when he spoke to Williams's stepmother, who advised Knight that she had told her stepson that Knight was looking for him. According to Knight's testimony, Williams's stepmother said that her stepson told her he would call Knight. Williams never called Knight.
Even after the grand jury returned an indictment against the appellant, Knight continued to look for Williams. He discovered that Williams was wanted by the police. Knight had a "hold" put on him, so that if Williams was arrested, Knight would be notified that Williams was in custody. Williams was arrested and detained by juvenile authorities. However, rather than holding Williams as Knight had requested, the juvenile authorities released him.
An examination of the record reveals that subpoenas were issued on September 30, 1996, slightly more than two months prior to the appellant's scheduled trial date of December 2, 1996, and Williams was apparently subpoenaed. Despite the fact that Williams had been subpoenaed, the prosecutor was uncertain whether Williams would actually be present to testify. Accordingly, on the day before the appellant's trial was to begin, Knight again went out and attempted to locate Billy Joe Williams. Knight spoke with Williams's juvenile probation officer, who gave him an address and telephone number for Williams. Knight immediately attempted to contact Williams by telephone. He managed to speak with some of Williams's relatives, who told him that Williams was not staying with them. They advised Knight that Williams was staying in a place called "Tent City," and that they would try and contact Williams to let him know that he was needed to testify in court. Despite all of Knight's efforts, he was unable to locate Williams and to secure his presence for the appellant's trial.
Whether a witness is unavailable is addressed to the sound discretion of the trial court. Johnson v. State, 623 So.2d at 448; Nolen v. State, 469 So.2d 1326, 1328 (Ala.Cr. App.1985). Knight's testimony established the lengths to which the prosecution went to secure Williams's presence at trial. Although there was no evidence presented that anyone from the district attorney's office ever approached a judge for an order compelling Williams's attendance, Alabama case-law does not require that the state exhaust every avenue in attempting to locate a witness before the witness may be considered unavailable. We addressed this issue in the capital murder case of Tomlin v. State, 591 So.2d 550, 559 (Ala.Cr.App.1991), in which we reversed the defendant's conviction on other grounds:
"The record indicates that the state made legitimate efforts to locate both of these witnesses prior to trial. The last known address, last known employer, and the telephone records for each witness were checked in an attempt to find the witness. While more might possibly have been done by the state in this regard, the trial court did not abuse its discretion by receiving this testimony into evidence. See Nolen v. State, 469 So.2d 1326 (Ala.Cr. App.1985)."
We believe the facts of this case to be analogous to those in Johnson v. State, supra 623 So.2d 444, 447 (Ala.Cr.App.1993), wherein this Court addressed the question whether the trial court erred in admitting into evidence the preliminary hearing testimony of an "unavailable" prosecution witness. Here, as in Johnson, the state presented evidence of its diligent, but unsuccessful, efforts to procure the attendance of a witness who himself was facing criminal charges. Certainly, in a city the size of Birmingham, it *128 would be extremely difficult to locate a male teenager who did not want to be found, especially if he would have to testify against a compatriot if he was found. We have found no caselaw that convinces us that the trial court abused its discretion in determining that Billy Joe Williams was an "unavailable witness." Indeed, we have found few cases wherein this court reversed the trial court's determination that a witness was unavailable and allowed the witness's prior testimony to be read into evidence. Each of these cases are factually distinguishable. For example, in Pettway v. State, 597 So.2d 737, 739-40 (Ala.Cr.App.1992), the witness whom the trial court erroneously determined to be "unavailable," was, in fact, an obstetrician with scheduling problems. This court held that the trial court abused its discretion by declaring the witness unavailable without any showing by the state that it had attempted to work around the obstetrician's scheduling problems by arranging for him to testify "out-of-turn" at a pre-arranged time, or requesting that he make arrangements for another physician to "cover" for him during his absence. In an earlier case, Rouse v. State, 548 So.2d 643, 646 (Ala.Cr.App.1989), we held that the trial court abused its discretion in determining that the state medical examiner was "unavailable," where the examiner was only temporarily out of state on a vacation, where no real effort was made to locate him, and where the state was tardy in notifying him of the impending trial. However, in Matkins v. State, 521 So.2d 1040, 1041-42 (Ala.Cr.App.1987), we determined that, although the trial court erred in determining that a witness was "unavailable," absent any efforts other than asking others about the whereabouts of the witness in the community in which he resided, admission of the prior testimony was harmless error, because the testimony was cumulative.
In this case, we believe that the state exercised due diligence in its efforts to locate Williams. The facts of this case differ substantially from those in Pettway and Rouse. In each of those cases, the "unavailable" witness was a recognized member of the community, who was easy to contact. In this case, the "unavailable" witness was a male teenager with pending juvenile charges whom the state sought to testify against a compatriot. We believe that, unless this witness wanted to be found, locating him would have been virtually impossible. While Williams was the only witness to the shooting, he testified that he was looking out the car window in the other direction and that he did not see anything that happened between the appellant and the victim prior to the shooting. He only turned to see what was happening after he heard the gunshots. Thus, any additional cross-examination of the witness as to what he saw would have been only marginally beneficial, at best. Moreover, the appellant did not dispute that he shot the victim, but merely contended that he had acted in self-defense. Thus, it was the appellant's credibility, rather than Williams's, that was critical to the defense's theory of the case. Given these circumstances, the state presented sufficient evidence of its efforts to justify the trial court's conclusion that the state had exercised due diligence in attempting to secure the presence of Billy Joe Williams at trial. Indeed, we believe that it would have been unreasonable to expect the prosecution to seek, or for the trial court to order, a city-wide police dragnet in what would almost certainly have been a futile attempt to locate this witness. Accordingly, the trial court did not abuse its discretion in receiving into evidence the former testimony of Billy Joe Williams from the prior proceeding.

III.
The appellant also contends that his sentence of life imprisonment without the possibility of parole violates the Eighth Amendment's prohibition against cruel and unusual punishment. Specifically, he argues that "the sentences are completely disproportionate to the offense charged, bearing no rational relationship with the offenses or to any legitimate state interest."
Because the appellant's sentence falls within the proper statutory range for a capital murder conviction, no jurisdictional question arises with regard to his sentence. Harris v. State, 563 So.2d 9, 11 (Ala.Cr.App. 1989). Thus, an objection at trial was necessary to properly preserve this issue for appellate *129 review. Our review of the record reveals that no challenge to the appellant's sentence was made at the trial court level. Accordingly, the appellant failed to preserve this issue for appellate review.
We further note that even if this issue had been preserved for our review, the appellant's contention would fail for lack of proof under Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). See also Walker v. State, 523 So.2d 528, 538 (Ala.Cr.App. 1988).
The judgment of the trial court is therefore affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN and BASCHAB, JJ., concur.
COBB, J., dissents with opinion.
COBB, Judge, dissenting.
The majority has adequately highlighted the law regarding the admissibility of the former testimony of an unavailable witness. The difficulty is not in summarizing Rule 804(a)(5), Ala. R. Evid., but in applying that rule. The question, simply put, is whether the only eyewitness in this capital case was "unavailable" to testify at trial.
I strongly disagree with the majority's conclusion that the State met its burden in order for the trial court to conclude that the witness was unavailable.
As authority for its position, the majority cites Johnson v. State, 623 So.2d 444 (Ala.Cr. App.1993). It is clear that this court in Johnson set a much higher standard for proving that the State exercised due diligence in its attempt to procure the presence of a witness than the majority applies today. Johnson does not indicate whether the witness was an eyewitness but it does make it clear that the trial court conducted an extensive hearing before it determined that the witness was unavailable.
"The hearing included the testimony of the witness's mother, the witness's girlfriend, an investigator for the State, and a jailer for the city. The witness had a murder charge, unconnected to the case at bar, pending against him and had recently escaped from jail. Each person who testified to the witness's unavailability indicated that each had made efforts to locate the witness, but that he could not be found."
623 So.2d at 447.
Even in light of the fact that the appellant was facing the most serious of charges, my review of the record reveals that the State exerted only a minimal effort to find the witness and that the State failed to present nonhearsay testimony of relatives or police officers to the effect that they had had no contact with the witness. The investigator who was the State's only witness at the hearing on the State's motion testified as follows during cross-examination:
"BY MR. NEUMANN:
"Q. Morgan, you said that there was trouble trying to find Billy Williams back around the grand jury?
"A. I couldn't find him.
"Q. Couldn't find him; and in searching for him you said you talked to some relatives, and checked with utilities, and asked a relative to tell him to give you a call; is that right?
"A. Uh-huh.
"Q. So, he never called you?
"A. He didn't call me, no, sir.
"Q. Between that time and this time, he, apparently, was served by the sheriffs department with a subpoena; is that right?
"A. I was told that he was, yes, sir; I don't know.
"Q. DidFrom the time that you made the search warrant of the grand jury until yesterday, did you make any attempt to contact Mr. Williams?
"A. Until the time what, sir?
"Q. Between the timethe first time you looked for him for the grand jury and yesterday; between those two periods of time did you make any attempt to find Mr. Williams?
"A. Yeah; found out he was wanted by the police and I had hold put on him if he got arrested and he did get arrested, but they let him go[a] juvenile.

*130 "Q. So, another agency or the Birmingham Police Department found him during that period of time and took him to Juvenile Court and they released him?
"A. Somebody put him in Juvenile and they were supposed to hold him and they did not, I found out yesterday; they let him go.
"Q. When was he put in Juvenile Court?
"A. I don't know.
"Q. When did you put the hold on him?
"A. When I couldn't find him for the grand jury and found out he was wanted.
"Q. Who was he released to?
"A. I don't have any idea; they just turned him loose. And, probation officer, Mr. Toole, told me he was living over here with his stepmother and father, but they say he is not.
"Q. Did you check to see who he was released to?
"A. No, sir, I just checked with the probation officer and told him what I wanted, and he said he was living with his stepmother and his father at this address and phone number.
"Q. Did you go to that address?
"A. No, sir, I called them and nobody was ever there, and then I was able to talk to them both yesterday on the telephone.
"Q. But you never went out to the address to look for him?
"A. No, sir.
"Q. Again, did you or anyone from the district attorney's office ever approach any circuit judge for an order compelling Mr. Williams to appear in court on a Capital Murder case?
"A. I didn't.
"Q. Has there been any attachment issued for Mr. Williams?
"A. I don't have any idea."
R. 242-46.
It is apparent from the record that the investigator conducted his search primarily by telephone and when told by Williams's juvenile probation officer that Williams was in Tent City, he did not go look for him; he depended on someone else to do "the looking" (R. 241). Williams was not "unavailable" when he was served with his subpoena by the Jefferson County Sheriffs office, was picked up by the police, or had contact with family and friends immediately before trial. This recalcitrant witness might have been found if the State had requested that the court issue a warrant for Williams's arrest and had thereafter commissioned only a few of the hundreds of law enforcement officers who work for the city or county to find him. If the State had done this, its search would have come much closer to being able to be described as diligent.
The circumstances in Johnson illustrate perfectly why the request for an alias or capias warrant for the absent witness would be an exercise in futility, and why, therefore, such a request should not be a condition precedent to declaring a witness unavailable. The case at bar is different, however. Though both witnesses had outstanding warrants, the unavailable witness in Johnson had murder charges pending against him; this was not so in the present case.
The law requires that a defendant facing any criminal charge, much less a capital murder charge, at the very least have an opportunity to confront and to cross-examine his accuser. The opportunity afforded by a preliminary hearing is typically soon after arrest and long before a defense team has thoroughly investigated the facts surrounding the crime. The confrontation of an eyewitness at a preliminary hearing, though satisfying the requirements of Rule 804(b)(1), is still a poor substitute for the kind of confrontation and cross-examination that a full-blown trial affords.
This is a senseless crime, in which a human was killed over $5.00; however, affirming the trial court's judgment results in an unacceptable standard for determining the unavailability of a witness. Hence, I respectfully dissent.
NOTES
[1] While the record does not affirmatively reflect that the witness was sworn before he testified at the preliminary hearing, the hearing was a formal judicial proceeding. Thus, in the absence of evidence to the contrary, it is assumed "that the witness was duly sworn to tell the truth." C. Gamble, McElroy's Alabama Evidence § 245.07(3) (5th ed.1996).
[2] The appellant was indicted by the July 1996 session of the Jefferson County grand jury.