The majority has adequately highlighted the law regarding the admissibility of the former testimony of an unavailable witness. The difficulty is not summarizing Rule 804(a)(5), Ala. R. Evid., but in applying that rule. The question, simply put, is whether the only eyewitness in this capital case was "unavailable" to testify at trial.
I strongly disagree with the majority's conclusion that the State met its burden in order for the trial court to conclude that the witness was unavailable.
As authority for its position, the majority cites Johnson v.State, 623 So.2d 444 (Ala.Cr.App. 1993). It is clear that this court in Johnson set a much higher standard for proving that the State exercised due diligence in its attempt to procure the presence of a witness than the majority applies today. Johnson
does not indicate whether the witness was an eyewitness but it does make it clear that the trial court conducted an extensive hearing before it determined that the witness was unavailable.
 "The hearing included the testimony of the witness's mother, the witness's girlfriend, an investigator for the State, and a jailer for the city. The witness had a murder charge, unconnected to the case at bar, pending against him and had recently escaped from jail. Each person who testified to the witness's unavailability indicated that each had made efforts to locate the witness, but that he could not be found."
623 So.2d at 447.
Even in light of the fact that the appellant was facing the most serious of charges, my review of the record reveals that the State exerted only a minimal effort to find the witness and that the State failed to present nonhearsay testimony of relatives or police officers to the effect that they had had no contact with the witness. The investigator who was the State's only witness at the hearing on the State's motion testified as follows during cross-examination:
"BY MR. NEUMANN:
 "Q. Morgan, you said that there was trouble trying to find Billy Williams back around the grand jury?
"A. I couldn't find him.
 "Q. Couldn't find him; and in searching for him you said you talked to some relatives, and checked with utilities, and asked a relative to tell him to give you a call; is that right?
"A. Uh-huh.
"Q. So, he never called you?
"A. He didn't call me, no, sir.
 "Q. Between that time and this time, he, apparently, was served by the sheriff's department with a subpoena; is that right?
 "A. I was told that he was, yes, sir; I don't know.
 "Q. Did — From the time that you made the search warrant of the grand jury until yesterday, did you make any attempt to contact Mr. Williams?
"A. Until the time what, sir?
 "Q. Between the time — the first time you looked for him for the grand jury and yesterday; between those two periods of time did you make any attempt to find Mr. Williams?
 "A. Yeah; found out he was wanted by the police and I had hold put on him if he got arrested and he did get arrested, but they let him go — [a] juvenile. *Page 130 
"Q. So, another agency or the Birmingham Police Department found him during that period of time and took him to Juvenile Court and they released him?
 "A. Somebody put him in Juvenile and they were supposed to hold him and they did not, I found out yesterday; they let him go.
"Q. When was he put in Juvenile Court?
"A. I don't know.
"Q. When did you put the hold on him?
 "A. When I couldn't find him for the grand jury and found out he was wanted.
"Q. Who was he released to?
 "A. I don't have any idea; they just turned him loose. And, probation officer, Mr. Toole, told me he was living over here with his stepmother and father, but they say he is not.
 "Q. Did you check to see who he was released to?
 "A. No, sir, I just checked with the probation officer and told him what I wanted, and he said he was living with his stepmother and his father at this address and phone number.
"Q. Did you go to that address?
 "A. No, sir, I called them and nobody was ever there, and then I was able to talk to them both yesterday on the telephone.
 "Q. But you never went out to the address to look for him?
"A. No, sir.
 "Q. Again, did you or anyone from the district attorney's office ever approach any circuit judge for an order compelling Mr. Williams to appear in court on a Capital Murder case?
"A. I didn't.
 "Q. Has there been any attachment issued for Mr. Williams?
"A. I don't have any idea."
R. 242-46.
It is apparent from the record that the investigator conducted his search primarily by telephone and when told by Williams's juvenile probation officer that Williams was in Tent City, he did not go look for him; he depended on someone else to do "the looking" (R. 241). Williams was not "unavailable" when he was served with his subpoena by the Jefferson County Sheriff's office, was picked up by the police, or had contact with family and friends immediately before trial. This recalcitrant witness might have been found if the State had requested that the court issue a warrant for Williams's arrest and had thereafter commissioned only a few of the hundreds of law enforcement officers who work for the city or county to find him. If the State had done this, its search would have come much closer to being able to be described as diligent.
The circumstances in Johnson illustrate perfectly why the request for an alias or capias warrant for the absent witness would be an exercise in futility, and why, therefore, such a request should not be a condition precedent to declaring a witness unavailable. The case at bar is different, however. Though both witnesses had outstanding warrants, the unavailable witness in Johnson had murder charges pending against him; this was not so in the present case.
The law requires that a defendant facing any criminal charge, much less a capital murder charge, at the very least have an opportunity to confront and to cross-examine his accuser. The opportunity afforded by a preliminary hearing is typically soon after arrest and long before a defense team has thoroughly investigated the facts surrounding the crime. The confrontation of an eyewitness at a preliminary hearing, though satisfying the requirements of Rule 804(b)(1), is still a poor substitute for the kind of confrontation and cross-examination that a full-blown trial affords.
This is a senseless crime, in which a human was killed over $5.00; however, affirming the trial court's judgment results in an unacceptable standard for determining the unavailability of a witness. Hence, I respectfully dissent. *Page 131